IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| HARK'N TECHNOLOGIES, INC., a Utah corporation,<br><br>Plaintiff,<br><br>v.<br><br>ORANGE WHIP FITNESS X, LLC, et al.,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART [118] DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>Case No. 1:21-cv-00054-CMR<br><br>Magistrate Judge Cecilia M. Romero |

Before the court is Defendants Orange Whip Fitness X, LLC (Orange Whip), Douglas J. Wald (Wald), and Brian J. Newman's (Newman) (collectively, Defendants) Motion for Partial Summary Judgment (Motion) (ECF 118) regarding Plaintiff Hark'n Technologies, Inc.'s (Plaintiff or Hark'n) first, second, and tenth claims for relief as stated in the Complaint (ECF 2). The court has also considered Plaintiff's opposition to the Motion (ECF 143) and Defendants' reply (ECF 147). On March 7, 2025, the court heard oral argument on the Motion (ECF 157). For the reasons set forth below, the court GRANTS IN PART and DENIES IN PART Defendants' Motion.

I. BACKGROUND

Plaintiff is a Utah corporation that manufactures and distributes sleeved elastics used in the personal exercise and fitness industry (ECF 120-6 at 16–29). One of the primary pieces of equipment manufactured by Plaintiff are "Slastix" (Slastix) resistance bands which are comprised of stretch resistant elastic materials sheathed in a protective sleeve (*id.* at 21–27). Plaintiff sells

1

this product under its brand "STROOPS," and Plaintiff also possesses the federal trademark registration for STROOPS[1] (*id.* at 33–35).

Orange Whip is a company based in South Carolina that develops, markets, and sells various golf training products and services (ECF 122-1 at 18–27). Newman and Wald are the CEO and COO of Orange Whip (ECF 118 at 7). In 2019, Newman and Wald approached Shon Harker (Harker), the president of Hark'n, about designing and manufacturing custom elastic bands for Orange Whip's golf products (ECF 120-6 at 16, 55–56). In January of 2019, Defendants purchased 106 prototypes from Plaintiff (ECF 145-4). Defendants then used several of those prototypes to film golf fitness videos and ads and eventually sold those prototypes to its customers (ECF 122-3).

Between January and March 2019, "the parties exchanged potential terms and conditions for a product design and manufacturing agreement" (PDMA) (ECF 118 at 8; ECF 122-3). In what appears to be the latest iteration of the PDMA, which the parties submitted into evidence, the agreement indicates that Defendants had anticipated purchasing approximately 7500 units from Plaintiff (ECF 122-3 at 5). Those "units" were, at the time, to be composed of several Slastix bands, of differing lengths and resistances, along with various other pieces of equipment that would comprise what the parties refer to as a the "[k]it" (*id.* at 8).

On March 25, Stephen Bean (Bean), one of Plaintiff's attorneys, had a phone call with Wald and Newman to discuss the terms of the PDMA (ECF 145-3 at 2–3). Following that discussion, Bean sent Defendants an email with the revised agreement and represented to Defendants that he would "talk with [Harker] and fill him in on our discussion" (ECF 122-3 at 33). Bean added that "[h]opefully, the parties can sign this and move on" (*id.*). Around that same time,

---

[1] U.S. Reg. No. 3637643.

Wald emailed Bean reminding him that Defendants "are waiting on the prototypes before [they] can sign [the PDMA]" (*id.* at 32).

Later that day, Harker joined in the email chain stating that he was aware there "was a question about the price and the items in the kit" so he provided a spreadsheet to Defendants and further indicated that the prices for "individual piece[s]" would be "substantially different" than it would be if Defendants were to purchase the items in a kit as the parties had previously discussed (*id.* at 37). Wald responded to Harker stating that Defendants had "not had a chance to test the new prototype to determine if we want to go that route" (*id.* at 41–42). Wald further noted that "[t]he contract states the price to be $66.50" and inquired whether the price would change substantially if Defendants decided "that the BRA concept doesn't work at all"[2] (*id.* at 42). The parties proceeded to discuss via this email exchange various items and specifications of the products that Harker was developing for Defendants (*id.* at 31–65). At one point, Harker indicated he was still "putting together a few ideas" for Defendants, and he asked whether he should wait a few days before proceeding with the prototypes (*id.* at 40–41).

In the following days and weeks, there were more discussions between the parties about the items Defendants would be ordering from Plaintiff, and it appears that a large point of contention surrounded whether the products would be sold to Defendants as individual pieces or in kits (*id.* at 45–65). On May 6, 2019, Harker contacted Defendants indicating that "there has been a substantial amount of [research and development] and samples" put into the products he was creating for Defendants and, as a result, the price and "[m]inimum units" that Defendants would need to be purchasing from Plaintiff would need to be increased (*id.* at 62). Newman

---

[2] The "BRA" was apparently a separate product that "could be used to retrofit" the existing products that Orange Whip sold that had no "band attachment points" for the connection of the resistance bands that Harker was developing for Defendants (ECF 143 at 9; ECF 157).

3

responded with questions for Harker, specifically asking whether Harker could "explain the increase of the kits by $10 plus" (*id.*). On May 9, 2019, Wald then contacted Harker stating they would offer a set price for 500 units but would not be "guaranteeing any orders beyond" that amount (*id.* at 64). Following this, no agreement was ever signed, and Defendants immediately began looking for a new supplier (ECF 122-4 at 2).

On May 10, 2019, Wald reached out to a colleague requesting the contact info of a supplier that could help Defendants "with the resistance bands" (*id.*). Defendants were then put in contact with "Ideal Joy," a company that Wald's colleague indicated was a "one stop shop for all things golf" (*id.* at 5). Wald conveyed to Ideal Joy that their "current supplier of these product[s] is no longer available" which left Defendants "in a time crunch" (*id.* at 4). In response, Ideal Joy asked Defendants to send "samples for the resistance bands" (*id.* at 6). Defendants then sent Ideal Joy some of the prototypes that had been developed by Plaintiff, along with other product specifications (*id.* at 8–19).

On April 14, 2021, Plaintiff initiated this suit against Defendants, asserting ten causes of action (ECF 2).[3] Relevant to the present Motion is Plaintiff's first, second, and tenth claims for relief which assert causes of action against Defendants for fraud, breach of contract, and unjust enrichment respectively (*id.* at 30–34, 46).

Plaintiff's fraud claim asserts that Wald and Newman, acting on behalf of Orange Whip, represented to Harker that once the prototypes were created "to Defendants' specifications" that "Defendants would enter into an agreement with [Plaintiff] for the purchase of 7,500" kits (*id.* at

---

[3] In addition to Orange Whip, Wald, and Newman, Plaintiff also listed three additional defendants: Jimmy Hack Golf, LLC, Golf Fitness X, and James A. Hackenberg (ECF 2 at 1). Early on in the litigation, in response to a motion to dismiss file by Defendants, "Plaintiff concede[d] all claims against Golf Fitness X and Hackenberg should be dismissed without prejudice" (ECF 51 at 3). Those defendants were accordingly dismissed (*id.* at 6) and, in a separate order, Jimmy Hack Golf was also dismissed (ECF 66 at 24).

31). Plaintiff maintains that this representation was false because Defendants never intended to enter into a contract with Plaintiff and, instead, made promises to Harker with the intention of inducing him to create a prototype that Defendants could then take to a different supplier (*id.* at 31–32). Alternatively, Plaintiff asserts a claim for breach of contract, maintaining that the PDMA that Bean sent to Defendants in March 2019 represented the material terms of the parties' agreement and Defendants had promised to sign the contract once they received the prototypes (*id.* at 33). Plaintiff thus asserts that the failure of Defendants to "timely purchase 7,500" kits from Plaintiff is a material breach of the parties' contract (*id.*). The other alternative claim raised by Plaintiff is for unjust enrichment (*id.* at 46). Plaintiff asserts it "conferred a benefit on Defendants by sending them three shipments of uniquely designed prototypes without charge" (*id.*). According to Plaintiff, Defendants accepted these prototypes with "no intention of signing" the PDMA then used those prototypes, to their benefit, to create a different version of the product (*id.*).

After the Complaint was filed, this matter proceeded through discovery and, during his deposition, Harker testified that he spent "[a]bout 413" hours in connection with the research and development for the prototypes he delivered to Defendants (ECF 120-6 at 75–76, 187). But Harker also admitted that he does not typically charge for the research and development of a project (*id.* at 76). Harker apparently "assume[s] the risk" when he creates a prototype prior to a contract being signed because if the parties never enter into an agreement Harker is fully aware that he will not make any money related to that prototype (*id.*). Along those same lines, Harker further indicated that he "also assume[s] the risk like, in this particular case, where if they [Defendants] didn't sell" any of Harker's products, then he "[wouldn't] make any money" (*id.*). Several evaluations and estimates have apparently been presented regarding the costs incurred by Plaintiff during the

5

research and development process, ranging from $35,000 to $144,000 (*see* ECF 2 at 17; ECF 118 at 24; ECF 122-6 at 18–19).

On October 28, 2024, Defendants filed the present Motion, seeking dismissal of the entirety of Plaintiff's claims for fraud, breach of contract, and unjust enrichment (ECF 118). Defendants' argument regarding Plaintiff's fraud claim is twofold: (1) this claim is "barred by the statute of frauds" because the claim is "based on a promise to perform an unenforceable contract," and (2) "no evidence shows [Defendants] made a misrepresentation of a presently existing fact" (*id.*). As for the contract claim, Defendants assert that no contract exists between the parties because there was never a meeting of the minds thus Orange Whip never gave "unconditional assent" to all material terms presented in the PDMA (*id.* at 11–18). If the court were to find that an agreement was formed between the parties, Defendants further assert that the statute of frauds would render any purported agreement unenforceable (*id.* at 10). Finally, Defendants assert that Plaintiff's unjust enrichment claim is also barred by the statutes of frauds, there is insufficient evidence to establish the value of any benefit conferred on Defendants, and the retention of the prototypes by Orange Whip was not unjust (*id.* at 28–36). If the court does not find that the entirety of any of those claims be dismissed, Defendants alternatively seek the dismissal of those claims against Wald and Newman individually because their actions were conducted on behalf of Orange Whip and "no evidence exists to support piercing the corporate veil" in this matter (*id.* at 36–38). The court addresses each argument in turn.

## II.   LEGAL STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, courts "examine the record and all reasonable

inferences that might be drawn from it in the light most favorable to the non-moving party." *Barber ex rel. Barber v. Colorado Dept. of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009) (quoting *T-Mobile Cent., LLC v. Unified Gov't of Wyandotte Cnty.*, 546 F.3d 1299, 1306 (10th Cir. 2008)). "For there to be a 'genuine' dispute of fact, there must be more than a mere scintilla of evidence; to avoid summary judgment, the evidence must be such that a reasonable jury could return a verdict for the nonmoving party." *Aubrey v. Koppes*, 975 F.3d 995, 1004 (10th Cir. 2020) (quoting *Rocky Mountain Prestress, LLC v. Liberty Mut. Fire Ins. Co.*, 960 F.3d 1255, 1259 (10th Cir. 2020)). Thus, a "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Barber*, 562 F.3d at 1228 (quoting *Bruner v. Baker*, 506 F.3d 1021, 1025 (10th Cir. 2007)). Furthermore, "mere conclusory allegations are insufficient to establish an issue of fact under Fed. R. Civ. P. 56." *Barber*, 562 F.3d at 1228.

### III. DISCUSSION[4]

**A. Fraud**

Defendants argue entry of summary judgment in their favor on Plaintiff's fraud claim is appropriate because there is no evidence that Defendants made a misrepresentation of a presently existing fact (ECF 118 at 25). For the following reasons, the court agrees with Defendants.[5]

Under Utah law, "[a] finding of fraud must be based on the existence of all its essential elements." *Armed Forces Ins. Exch. v. Harrison*, 70 P.3d 35, 43 (Utah 2003) (quoting *Taylor v.*

---

[4] "A federal court exercising supplemental jurisdiction over state-law claims 'applies the substantive law, including choice of law rules, of the forum state.'" *Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1224 (D. Utah 2018) (quoting *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999)). Because the relevant events underlying Plaintiff's claims occurred in Utah, and the parties seemingly agree that Utah law applies to Plaintiff's state law claims, the court applies Utah's substantive law to Plaintiff's claims for fraud, breach of contract, and unjust enrichment.

[5] Because the court finds that the evidence does not support Plaintiff's fraud claim it need not consider Defendants' alternative argument for dismissal under the statute of frauds.

*Gasor, Inc.*, 607 P.2d 293, 294–95 (Utah 1980)). Thus, a plaintiff asserting a fraud claim must establish, by clear and convincing evidence, *see id.*, the following elements:

> (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.

*Id.* at 40 (quoting *Gold Standard, Inc. v. Getty Oil Co.*, 915 P.2d 1060, 1066–67 (Utah 1996)).

In the Complaint, Plaintiff asserts that Wald and Newman, acting on behalf of Orange Whip, represented to Harker that if he created prototypes to Defendants' specifications, then Defendants would enter into the PDMA (ECF 2 at 31). Plaintiff maintains that Wald and Newman's promise to sign the PDMA was "knowingly false and made for the purpose of deceiving" Harker into redesigning the prototype (*id.* at 31–32). First, Defendants argue that they had every intention of entering into a contract with Plaintiff, which is evident by Wald's testimony on behalf of Orange Whip that he always intended to enter an agreement with Plaintiff once the prototypes were approved (ECF 147 at 15; ECF 120-1 at 178–79). Second, Defendants point out that "[a] misrepresentation of intended future performance is not a representation concerning a 'presently existing fact' upon which a claim for fraud can be based unless [the plaintiff] can prove that [the defendant], at the time of the representation, did not intend to perform the promise and made the representation for the purpose of deceiving [the plaintiff]" (ECF 118 at 26 (quoting *Republic Group, Inc. v. Won-Door Corp.*, 883 P.2d 285, 292 (Utah Ct. App. 1994))). Defendants assert that Plaintiff simply cannot satisfy this burden based on the undisputed facts.

In its opposition to the Motion, Plaintiff argues that the evidence at least suggests that Defendants made a misrepresentation of a material fact, and Plaintiff points to the "proximity between Defendants' last communications with Plaintiff and their first communications with Ideal

Joy" (ECF 143 at 19). In Plaintiff's view, because Defendants reached out to another colleague, "[l]ess than 24 hours after their final communication to Plaintiff," this shows that Defendants had previously spoken about Ideal Joy with this colleague and "that Defendants were pursuing a foreign supplier" (*id.* at 19–20). But even in Plaintiff's version of events, there is no evidence that Defendants reached out to a different supplier until *after* the negotiations with Plaintiff had clearly failed. At most, this fact only demonstrates that Defendants were anxious to find a supplier of their product. Perhaps if there was some evidence that Defendants had already contracted with another supplier while they were still negotiating the PDMA terms with Plaintiff, then Plaintiff might have a colorable argument that Defendants had made a misrepresentation of a presently existing fact. However, there simply is no evidence to that effect, and Plaintiff has pointed to nowhere else in the record to support its claim.

Even though the evidence supporting Plaintiff's assertion that Defendants made a misrepresentation of a presently existing fact is purely speculative, Plaintiff further maintains that "[t]he existence of fraud is normally a fact question," and it would therefore be inappropriate for the court to grant Defendants summary judgment regarding this claim (ECF 143 at 18 (quoting *BD Medical Supplies LLC v. Bluestem Mgmt. Advisors, LLC*, 685 F. Supp. 3d 1062, 1078 (D. Kan. 2023))). While that may be true, courts have also recognized that "[f]raud is a wrong of such nature that it must be shown by clear and convincing proof and will not lie in mere suspicion or innuendo." *Armed Forces Ins. Exch.*, 70 P.3d at 43 (quoting *Taylor*, 607 P.2d at 294–95). Plaintiff therefore cannot avoid summary judgment by relying on evidence that is either vague or speculative. *See Levitt v. Iasis Healthcare Holdings Inc.*, 442 P.3d 1211, 1216 (Utah Ct. App 2019); *see also GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200–01 (10th Cir. 2022) (same). Instead, to avoid dismissal of its fraud claim, Plaintiff "must do more than simply show that there

is some metaphysical doubt as to the material facts." *Sec. & Exch. Comm'n v. GenAudio Inc.*, 32 F.4th 902, 920 (10th Cir. 2022) (quoting *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir. 2006)). "[S]tatements of mere belief" are accordingly "disregarded" once a matter reaches summary judgment. *GeoMetWatch*, 38 F.4th at 1200 (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006)).

Upon consideration of the relevant law, and undisputed facts, the court finds Plaintiff's position that there is evidence to support each element of its fraud claim is reliant on speculation and beliefs. It would therefore be inappropriate to present this issue to the jury, and the court finds it appropriate to grant summary judgment in favor of Defendants on Plaintiff's fraud claim.[6]

### B. Breach of Contract

Plaintiff's second cause of action is for breach of contract against Orange Whip (ECF 2 at 33). "The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Daz Mgmt., LLC v. Honnen Equip. Co.*, 508 P.3d 84, 91 n.26 (Utah 2022) (quoting *Richards v. Cook*, 314 P.3d 1040, 1043 (Utah Ct. App. 2013)). Defendants assert that Plaintiff cannot proceed with its breach of contract claim because there was never a meeting of the minds as to the material terms of said contract. On this point the court again agrees with Defendants.

Fundamental to the formation of a contract is that there be "a meeting of the minds." *Harris v. Albrecht*, 86 P.3d 728, 730 (Utah 2004); *see also Cardella v. Mountain Rsrvs., Inc.*, No. 2:07-cv-1003 BCW, 2009 WL 971925, at *13 (D. Utah Apr. 7, 2009) ("A meeting of the minds

---

[6] While the court's ruling on this issue relies on there not being evidence of a misrepresentation of a presently existing fact, the court further notes that it is not convinced that Defendants "promised" to sign the PDMA with the only condition being that Harker send Defendants the prototypes. As discussed further below, the court determines that there were ongoing negotiations, after the March 25, 2019 phone call with Bean, which demonstrate that the parties never had a meeting of the minds related to the essential terms of the contract.

between contracting parties is essential to the formation of any contract: A condition precedent to the enforcement of any contract is that there be a meeting of the minds of the parties, which must be spelled out, either expressly or implicitly, with sufficient definiteness to be enforced." (quoting *Commercial Union Assoc. v. Clayton*, 863 P.2d 29, 37 (Utah Ct. App. 1993))). This meeting of the minds requires that the parties agree "on the essential terms of the contract." *Jones v. Mackey Price Thompson & Ostler*, 355 P.3d 1000, 1009 (Utah 2015). Thus, a contract may not be formed "[s]o long as there is any uncertainty or indefiniteness, or future negotiations or considerations to be had between the parties." *Id.* (quoting *Prince, Yeates, & Geldzahler v. Young*, 94 P.3d 179, 184 (Utah 2004)).

As Utah courts have acknowledged, "[a] signature is perhaps the most common method by which a party can exhibit assent to the terms of a contract." *GeoMetWatch Corp. v. Utah State Univ.*, 538 P.3d 933, 939 (Utah Ct. App. 2023). That is, of course, not the only way for a binding contract to be created as parties might also "through words or actions" indicate that they have otherwise accepted the terms of the contract. *Id.* (quoting *Livingston v. Finco Holdings Corp.*, 513 P.3d 94, 100 (Utah Ct. App. 2022)). In this matter there is no dispute that a contract was never signed by the parties. Nevertheless, Plaintiff urges the court to find that the PDMA sent by Bean on March 25, 2019 to Wald and Newman contains the materials terms of the parties' agreement and that the PDMA is enforceable against the parties. Based on the undisputed facts however the court determines that the parties did not, through words or actions, assent to the terms of any contract and the PDMA is therefore not an enforceable agreement.

The most persuasive evidence that a meeting of the minds was never reached between the parties in this matter comes from the communications that followed the March 25 conversation between Bean, Wald, and Newman. Following that phone conversation, Wald sent an email to

11

Bean indicating that Defendants had to first receive the prototypes before they would sign any agreement (ECF 122-3 at 32), and Wald sent another email that same day to Harker stating that Defendants still needed "a chance to test the new prototype" (*id.* at 31). In that same conversation thread, Harker indicated he was aware of "a question about the price and the items in the kit," stating that the prices for "individual piece[s]" would be "substantially different" than it would be if Defendants were to purchase the individual items in the kit (*id.* at 37). Harker even stated at one point that he was still "putting together a few ideas" for Defendants, and he asked whether he should wait a few days before proceeding with the prototypes (*id.* at 40–41). This back and forth between the parties demonstrates that questions and concerns remained over whether the products purchased by Defendants would be sold as individual pieces or in kits (*id.* at 45–65). That question, in turn, raised other uncertainties with the price of the product that Defendants would be purchasing from Plaintiff. This is supported by Harker's acknowledgment that the price would be "substantially different" than the price previously discussed by the parties (*id.* at 37). At no point did Harker, or anyone else participating in that email exchange, indicate that the parties had already reached a firm agreement as to the ultimate price and product specifications that would be included in the contract. If that were so it would render that entire exchange, which occurred over several weeks, meaningless.

   It is undeniable that the price and specifications of the product that Defendants intended to purchase from Plaintiff were essential to the contract at issue; thus, the emails exchanged between the parties simply belie Plaintiff's assertion that the parties had reached an agreement as to all essential terms.

   Plaintiff resists this conclusion, pointing to Bean's declaration wherein he states that, during the March 25 conversation, he reached an understanding with Wald and Newman "that

Defendants would send a written confirmation that Defendants would sign the agreement if [Plaintiff] sent the final prototypes" (ECF 145-3 at 4). However, Bean's recollection of any purported agreement reached during that phone call is not dispositive and fails to overcome the overwhelming evidence contained in the parties' direct communications with one another which demonstrate that negotiations were ongoing. In other words, even if Bean's recollection of the phone conversation with Wald and Newman is correct, it is not enough to present a genuine issue of material fact to present to a jury.

Notwithstanding the undisputed facts as recounted above, Plaintiff still maintains that summary judgment is inappropriate to grant on this issue because "whether there is a meeting of the minds depends on whether the parties actually intended to contract, and the question of intent generally is one to be determined by the trier of fact" (ECF 143 at 16) (quoting *Brasher v. Christensen*, 374 P.3d 40, 44 (Utah Ct. App. 2016)). While a particular issue might be one that courts typically allow to proceed to a jury, that in and of itself does not defeat a motion for summary judgment. After all, as noted by the United States Supreme Court, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). To that end, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

In this matter, the story told by Plaintiff that the parties had reached a meeting of the minds as to the essential terms of the contract, which is supported to some degree by Bean's

13

declaration, is blatantly contradicted by the record. Plaintiff simply cannot overcome the clear implications raised by the communications between the parties that occurred *after* the March 25 phone call. Accordingly, the court finds that Plaintiff's position that an enforceable agreement was created via that phone call is simply contradicted by the record and summary judgment is appropriately granted in Defendants' favor on Plaintiff's breach of contract claim.[7]

### C. Unjust Enrichment

Plaintiff's tenth cause of action, which Defendants also seek dismissal of in its entirety, is for unjust enrichment. According to Defendants, this claim fails for three reasons: (1) it is barred by the statute of frauds, (2) there is insufficient evidence to establish the value of the purported benefit conferred, and (3) it was not unfair for Orange Whip to accept the prototypes (ECF 118 at 24–32). As outlined below, the court is unpersuaded by Defendants' arguments on this point and determines that a genuine issue of material fact exists to prevent entry of summary judgment on this claim.

Under Utah law, to prevail on a claim of unjust enrichment a party must establish three elements:

> (1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value.

*Rawlings v. Rawlings*, 240 P.3d 754, 763 (Utah 2010) (quoting *Jeffs v. Stubbs*, 970 P.2d 1234, 1248 (Utah 1998)). "A claim for unjust enrichment is an action brought in restitution, and a prerequisite for recovery on an unjust enrichment theory is the absence of an enforceable contract governing the rights and obligations of the parties relating to the conduct at issue." *Ashby v. Ashby*,

---

[7] In light of this determination, the court need not reach Defendants' alternative grounds for dismissal of Plaintiff's breach of contract claim.

227 P.3d 246, 250 (Utah 2010). Plaintiff's unjust enrichment claim asserts that it "conferred a benefit on Defendants by sending them three shipments of uniquely designed prototypes without charge,"[8] that Defendants "accepted these prototypes with an appreciation and knowledge of their value," and it would be inequitable for Defendants to retain the benefit of these prototypes without payment for their value (ECF 2 at 46). It is also undisputed that Defendants sent Plaintiff's prototypes to Ideal Joy, the manufacturer Defendants later hired, and those prototypes served as an aide in the creation of the products Orange Whip now offers (ECF 122-4 at 6–48).

First, the court turns to Defendants' argument that Plaintiff's unjust enrichment claim is barred by the statute of frauds. In the Motion, Defendants rely wholly on *Cargill, Inc. v. Stafford*, 553 F.2d 1222 (10th Cir. 1977) for the proposition that "[i]f unjust enrichment can be used to gain benefits from executory oral contracts barred by a statute of frauds, that statute is rendered meaningless." *Id.* at 1225. This finding in *Cargill* however is inapposite to the matter at hand. The parties in *Cargill* had an alleged oral agreement for the purchase of wheat but the defendant in that matter later informed the plaintiff, before any money or wheat had been exchanged, that he was cancelling any contract that may have existed between the parties. *Id.* at 1223. It was in that context that the Tenth Circuit determined that unjust enrichment was an inappropriate remedy because "[the plaintiff] did not perform any services for, convey any rights to, or confer any benefit on [the defendant]." *Id.* at 1224.

In this matter, Plaintiff conferred a benefit on Defendants by sending them the prototypes which makes this matter more analogous to the facts of *Zamora v. Quezada*, No. 2:22-cv-00616-

---

[8] It is not clear from the arguments of either party when these "three shipments" were sent to Defendants or what they contained. The parties seemingly agree that Defendants paid for the 106 prototypes that they ordered from Plaintiff in January of 2019 therefore those prototypes do not appear to form the basis for Plaintiff's unjust enrichment claim. Despite the details surrounding these shipments being far from clear, Defendants take no issue in the Motion with Plaintiff's assertion that they sent three shipments of prototypes to Defendants and that Defendants did not pay for these shipments (ECF 118 at 28–36). For purposes of this Motion the court thus considers this fact to be undisputed.

DBB, 2024 WL 3540885 (D. Utah July 25, 2024). In *Zamora*, the plaintiffs gave the defendants thousands of dollars on the belief that defendants were investing that money on behalf of plaintiffs. *Id.* at *1. The *Zamora* defendants similarly argued that "that the statute of frauds bar[red]" plaintiffs claim for unjust enrichment. *Id.* at *7. The court however quickly disposed of this argument finding it "a nonstarter," because "the statute of frauds would render any purported contract unenforceable, paving the way for a remedy in unjust enrichment." *Id.* The court reaches a similar conclusion here and finds that Defendants have not demonstrated that this claim is barred by the statute of frauds.

Next, the court turns to Defendants argument that there "is insufficient evidence to establish the value of the purported benefit conferred" (ECF 118 at 30). According to Defendants, Harker's testimony regarding the development process is not credible as he admitted in his testimony that "he doesn't account for his time in the development process" and he offered "no calculations, no dollar an hour rate, and no verifiable method for calculating the amount" (*id.* at 31). But this argument fails to account for the fact that, at the summary judgment stage, "the court should not weigh the evidence, make credibility determinations, or assess the credibility of conflicting testimony." *Lazy S Ranch Props., LLC v. Valero Terminaling & Distrib. Co.*, 92 F.4th 1189, 1198 (10th Cir. 2024); *see also Bennett v. Bigelow*, 387 P.3d 1016, 1021 n.2 (Utah 2016) ("[A]t summary judgment 'it is not for a court to weigh the evidence or assess credibility.'" (quoting *Webster v. Sill*, 675 P.2d 1170, 1172 (Utah 1983))). It is "[o]nly when a specific set of facts is 'blatantly contradicted by the record, so that no reasonable jury could believe it'" that the court may "choose to disregard those facts." *Lazy S Ranch*, 92 F.4th at 1198 (quoting *Norwood v. United Parcel Serv., Inc.*, 57 F.4th 779, 790 (10th Cir. 2023)). Even though Plaintiff has presented different valuations related to its unjust enrichment claim, ranging from $35,000 to $144,000 (*see*

ECF 2 at 17; ECF 118 at 24; ECF 122-6 at 18–19), the court finds that this issue deals more with the credibility of the witnesses relied on by Plaintiff and there is at least some basis from which the jury could formulate an award related to this claim.

Finally, the court turns to Defendants argument that "[i]t was not unfair for Orange Whip to take the prototypes" (ECF 188 at 34). On this point Defendants argue, with some force, that Plaintiff never expected payment for the prototypes, thus Plaintiff cannot demonstrate that Defendants retention of the prototypes without tendering payment to Plaintiff amounts to inequitable circumstances. The court notes that Harker's statements that he "assume[s] the risk" when he creates a prototype prior to a contract being signed (*see* ECF 120-6 at 75–76) does seem to undercut Plaintiff's unjust enrichment claim. Notwithstanding, Harker also testified that he can make up the cost if the agreement is signed (*see id.*). Regardless of this testimony, the court takes particular note of the fact that the parties' expectation related to whether there would be compensation for the benefit bestowed is not an element of an unjust enrichment claim. While such expectations certainly might be relevant to the claim, Defendants have presented no case law demonstrating that a plaintiff is barred from seeking unjust enrichment if they had little to no expectations of being compensated for the benefit they bestowed on the defendant. The court is therefore not persuaded that it would be unreasonable for a jury to conclude that, despite Harker's testimony, the totality of the circumstances demonstrate that it would be inequitable for Defendants to have accepted and retained the benefit conferred without payment of its value.

Upon considering the facts relevant to this claim, the court was also mindful that this is "a flexible and workable doctrine" and the court has "broad discretion . . . in its application of unjust enrichment law to the facts." *Rawlings*, 240 P.3d at 761 (quoting *Jeffs*, 970 P.2d at 1245). Given the nature of this claim, and the evidence presented, the court simply cannot determine that

there is no genuine issue of material fact related to Plaintiff's unjust enrichment claim. Accordingly, the court declines Defendants' request that Plaintiff's unjust enrichment claim be dismissed in its entirety.

### D. Individual Defendants Wald and Newman

Finally, the court turns to Defendants' argument that Plaintiff's claims against Wald and Newman fail because their actions were conducted on behalf of Orange Whip and "no evidence exists to support piercing the corporate veil" (ECF 118 at 37). As discussed above, the court agreed with Defendants that Plaintiff's claims for fraud and breach of contract should be dismissed in their entirety. But the court also determined that Plaintiff has demonstrated that there is a dispute of fact regarding its unjust enrichment claim. Accordingly, the court need only consider whether Wald and Newman can be held individually liable concerning Plaintiff's unjust enrichment claim.

As Defendants point out, "[t]he corporate structure is an artificial construct of the law, a substantial purpose of which is to create an incentive for investment by limiting exposure to personal liability." *N.L.R.B. v. Greater Kansas City Roofing*, 2 F.3d 1047, 1051 (10th Cir. 1993). Thus, for individuals such as Wald and Newman to be "liable on the obligations of the corporation" Plaintiff must pierce the corporate veil. *Boulder Falcon, LLC v. Brown*, 720 F. Supp. 3d 1175, 1200 (D. Utah 2024). Piercing the corporate veil under federal law and Utah law require similar showings. Under the federal common law, a plaintiff attempting to pierce the corporate veil must show (1) that there was "such unity of interest and lack of respect given to the separate identity of the corporation by its shareholders that the personalities and assets of the corporation and the individual are indistinct," and (2) that "adherence to the corporate fiction sanction a fraud, promote injustice, or lead to an evasion of legal obligations." *N.L.R.B.*, 2 F.3d at 1052. Utah law similarly requires a showing that (1) "such unity of interest and ownership that the separate personalities of

the corporation and the individual no longer exist," and (2) that "observance of the corporate form would sanction a fraud, promote injustice, or an inequitable result would follow." *Norman v. Murray First Thrift & Loan Co.*, 596 P.2d 1028, 1030 (Utah 1979).

Plaintiff does not argue that there is any evidence as would support piercing the corporate veil to hold Wald and Newman personally liable. Instead, Plaintiff relies on case law which demonstrates that, under certain circumstances, corporate officers may still be held personally liable for fraud, *see, e.g.*, *Armed Forces Ins. Exch. v. Harrison*, 70 P.3d 35 (Utah 2003), or otherwise tortious acts, *see, e.g.*, *d'Elia v. Rice Development, Inc.*, 147 P.3d 515 (Utah 2006) (ECF 143 at 26). Unjust enrichment falls into neither of those categories. This court has previously found that, under Utah law, "[u]njust enrichment sounds neither in tort, nor contract, but is an equitable claim based on restitution." *Brumbelow v. L. Offs. of Bennett & Deloney, P.C.*, 372 F. Supp. 2d 615, 623 (D. Utah 2005). Plaintiff has presented no case law which supports its position that a corporate officer can be held liable for unjust enrichment without piercing the corporate veil.

In this matter, any benefit that was conferred was conferred on Orange Whip and not the individual defendants. Because Plaintiff has not presented any basis for piercing the corporate veil, "summary judgment in favor of the individual defendants is appropriate on this claim for relief." *Id.* at 622–23. For these reasons, the court dismisses Plaintiff's unjust enrichment claim against Defendants Newman and Wald.

### IV. CONCLUSION AND ORDER

For the foregoing reasons, Defendants' Motion for Partial Summary Judgement (ECF 118) is GRANTED IN PART and DENIED IN PART as follows:

1. Defendants' request that Plaintiff's claim for fraud be dismissed is GRANTED;

19

2. Defendants' request that Plaintiff's claim for breach of contract be dismissed is GRANTED;

3. Defendants' request that Plaintiff's claim for unjust enrichment against Orange Whip be dismissed is DENIED; and

4. Defendants' request the Plaintiff's claim for unjust enrichment against Douglas J. Wald and Brian J. Newman individually be dismissed is GRANTED.

IT IS SO ORDERED.

DATED this 14 March 2025.

_____
Magistrate Judge Cecilia M. Romero
United States District Court for the District of Utah