IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| HARK'N TECHNOLOGIES, INC., a Utah corporation,<br><br>    Plaintiff,<br><br>v.<br><br>ORANGE WHIP FITNESS X, LLC, et al.,<br><br>    Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART [117] DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No. 1:21-cv-00054-CMR<br><br>Magistrate Judge Cecilia M. Romero |

Before the court is Defendants Orange Whip Fitness X, LLC (Orange Whip), Douglas J. Wald (Wald), and Brian J. Newman's (Newman) (collectively, Defendants) Motion for Partial Summary Judgment (Motion) (ECF 117) regarding Plaintiff Hark'n Technologies, Inc.'s (Plaintiff or Hark'n) third, fourth, fifth, sixth, seventh, eighth, and ninth causes of action as stated in the Complaint (ECF 2). The court has also considered Plaintiff's opposition to the Motion (ECF 144) and Defendants' reply (ECF 148). On March 7, 2025, the court heard oral argument on the Motion (ECF 157). The supplemental briefing submitted by the parties following oral argument was also considered by the court (ECF 158; ECF 159). For the reasons set forth in summary at the March 14, 2025 hearing (ECF 162) and as set forth below in greater detail, the court GRANTS IN PART and DENIES IN PART Defendants' Motion.

# I.    BACKGROUND[1]

Hark'n is a Utah corporation that manufactures and distributes sleeved elastics used in the personal exercise and fitness industry (ECF 120-6 at 16–29), and Orange Whip is a company based in South Carolina that develops, markets, and sells various golf training products and services (ECF 122-1 at 18–27). One of the primary pieces of equipment manufactured by Plaintiff are "Slastix" (Slastix) resistance bands which are comprised of stretch resistant elastic materials sheathed in a protective sleeve (*id.* at 21–27). Plaintiff sells this product under its brand "STROOPS," and Plaintiff also possesses the federal trademark registration for STROOPS[2] (*id.* at 33–35). In 2019, Wald and Newman, the CEO and COO of Orange Whip, approached Shon Harker (Harker), the president of Hark'n, about designing and manufacturing custom elastic bands for Orange Whip's golf products (ECF 120-6 at 16, 55–56).

In January of 2019, Defendants purchased 106 preliminary kits from Plaintiff that included the orange resistance bands (ECF 145-4). Defendants then used several of those kits to film golf fitness videos and ads and eventually sold those kits to its customers (ECF 122-3).

As discussed in the court's earlier memorandum decision, the parties never reached a meeting of the minds related to the contract terms for any manufacturing agreement (ECF 160). There was however a draft of a product design and manufacturing agreement (PDMA) which an attorney for Plaintiff sent to Defendants, but that agreement was never signed (ECF 118 at 8; ECF 122-3). One provision of the PDMA provides in part that "no license or any other right is granted

---

[1] In the court's earlier memorandum decision and order (ECF 160) ruling on Defendants' Motion for Partial Summary Judgment on Plaintiff's first, second, and tenth causes of action (ECF 118), the court recounted a majority of the facts relevant to this suit. For the sake of brevity, the court only recounts those facts relevant to the present Motion.

[2] U.S. Reg. No. 3637643.

to one party or any sublicensee in respect to any patent, trademark, copyright, know-how, trade secret, or other Intellectual Property rights owned by the other party" (ECF 122-3 at 22).

After it became clear that Defendants would not be ordering any products from Plaintiff, on May 10, 2019, Wald reached out to a colleague requesting the contact information of a supplier that could help Defendants "with the resistance bands" (ECF 122-4 at 2). Defendants were then put in contact with "Ideal Joy," a company that Wald's colleague indicated was a "one stop shop for all things golf" (*id.* at 5). Wald conveyed to Ideal Joy that their "current supplier of these product[s] is no longer available" which left Defendants "in a time crunch" (*id.* at 4). In response, Ideal Joy asked Defendants to send "samples for the resistance bands" (*id.* at 6). Defendants then sent Ideal Joy some of the prototypes that had been developed by Plaintiff, along with other product specifications (*id.* at 8–19).

On April 14, 2021, Plaintiff initiated this suit against Defendants, asserting ten causes of action (ECF 2). Relevant to the present Motion are Plaintiff's third, fourth, fifth, sixth, seventh, eighth, and ninth causes of action, asserting various claims under the Lanham Act[3] and Utah law (*id.* at 30–34, 46).

In the Complaint, Plaintiff describes the resistance bands "trade dress scheme" as "a composite of the following elements: a. Elastic bands inside of crinkled orange and black sheaths. b. Straps, clips, cuffs, loops, and/or handles that attach to said elastic bands, which are dressed in the color black with orange accents" (*id.* at 8). Plaintiff asserts that this trade dress is "non-functional," as the "combination of colors, crinkled sheaths, and attachments used" in the trade dress is "not essential to Slastix products" (*id.*). The Complaint further states that the trade dress

---

[3] The Lanham Act governs trademark law in the United States, *see* 15 U.S.C. § 1127, and "creates a cause of action for unfair competition through misleading advertising or labeling," *see POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107 (2014).

"has acquired secondary meaning in the eyes of the public and represents [Plaintiff] as the source of these high-quality products" and it further "distinguishes [Plaintiff's] goods from the goods of others in the industry" (*id.* at 8–9).

After the Complaint was filed, this matter proceeded through discovery and, during his deposition, Harker testified that he spent "[a]bout 413" hours in connection with the research and development for the prototypes he delivered to Defendants (ECF 120-6 at 75–76, 187). But Harker also admitted that he does not typically charge for the research and development of a project (*id.* at 76). According to Harker he "assume[s] the risk" when he creates a prototype prior to a contract being signed because if the parties never enter into an agreement Harker will not make any money related to that prototype (*id.*). Along those same lines, Harker further indicated that he "also assume[s] the risk like, in this particular case, where if they [Defendants] didn't sell" any of Harker's products, then he "[wouldn't] make any money" (*id.*). Harker also testified about the confidential or proprietary nature of his work. Harker claimed that the "makeup" of the material used for the prototypes, along with the sheath, and how the "connectors" are "configure[d]," is confidential and proprietary (*id.* at 114). However, when asked whether Harker shared "with Orange Whip any of the confidential information," Harker responded, "No" (*id.*). As for whether Harker shared with Defendants "any of the proprietary information," Harker again stated, "No," and "not that I recall" (*id.*).[4]

Also relevant to the present Motion is Harker's testimony regarding Orange Whip's promotional videos. Specifically, Harker was asked whether he knew "if Orange Whip ever

---

[4] After Defendants' counsel asked Harker if he shared any proprietary information with Defendants, Plaintiff's counsel objected to the question as being "[c]ompound," "[v]ague and ambiguous" (ECF 120-6 at 114). Notwithstanding this objection, Harker answered the question (*id.*), and Plaintiff did not object to Defendants' reliance on Harker's testimony on this point in response to the Motion (*see generally* ECF 144). Thus, for purposes of ruling on the Motion, the court considers Harker's statements that he did not share with Defendants any confidential or proprietary information.

advertised connection with STROOPS after the first half of the year of 2019, after July of 2019" (*id.* at 130). Harker responded that he knew "they had ads up or they had YouTube videos up that were still out in the public" (*id.*). When followed up with a question of whether Defendants were "advertising STROOPS," Harker stated that he "[didn't] know what they were doing" (*id.* at 131). And when asked whether "the products in those images were prototypes," Harker stated that he "[didn't] know exactly which ones they used" and he was "not sure" that he could say "that they were STROOPS products" (*id.*). In response to the question of whether Defendants "used the Stroops marks on anything other than" the 106 kits that Defendants bought from Plaintiff, Harker responded "No" (*id.* at 277). Later, Harker was asked "when [was] the most recent time that [he] viewed" the video promoting "both the STROOPS brand" and Orange Whip's products (*id.* at 167). Harker responded, "Yesterday" (*id.*). No follow-up questions were asked about the video that Harker claimed to have viewed.

Discovery also unearthed evidence related to the sales of Plaintiff's Slastix products and the costs it incurred in developing new products for Defendants. Several evaluations or estimates were submitted regarding the costs incurred by Plaintiff during the research and development process with estimates ranging from $35,000 to $144,000 (*see* ECF 2 at 17; ECF 118 at 24; ECF 122-6 at 18–19). In response to written interrogatories, Plaintiff indicated that, since 1999, it has "sold over 1.7 million units" of its Slastix products (ECF 120-11 at 5). And, since 2012, Plaintiff has "sold approximately 273,600 units of sheathed elastics bearing the asserted orange trade dress having a sales value of approximately $7 million" (*id.* at 8).

On October 28, 2024, Defendants filed the present Motion, seeking dismissal of the entirety of Plaintiff's claims for trade dress infringement, false designation of origin, trademark infringement, unfair competition, and misappropriation of trade secrets (ECF 117). Alternatively,

if the court does not find that the entirety of any of those claims should be dismissed, Defendants seek the dismissal of those claims against Wald and Newman individually because their actions were conducted on behalf of Orange Whip and no evidence exists to support piercing the corporate veil in this matter (*id.* at 58–59). Plaintiff provided a response to each of Defendants' asserted "undisputed facts" in the Motion (ECF 144 at 10–27), but did not provide any additional facts that Plaintiff believed the court should consider for purposes of ruling on the Motion.

## II.    LEGAL STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, courts "examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party." *Barber ex rel. Barber v. Colorado Dept. of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009) (quoting *T-Mobile Cent., LLC v. Unified Gov't of Wyandotte Cnty.*, 546 F.3d 1299, 1306 (10th Cir. 2008)). "For there to be a 'genuine' dispute of fact, there must be more than a mere scintilla of evidence; to avoid summary judgment, the evidence must be such that a reasonable jury could return a verdict for the nonmoving party." *Aubrey v. Koppes*, 975 F.3d 995, 1004 (10th Cir. 2020) (quoting *Rocky Mountain Prestress, LLC v. Liberty Mut. Fire Ins. Co.*, 960 F.3d 1255, 1259 (10th Cir. 2020)). Thus, a "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Barber*, 562 F.3d at 1228 (quoting *Bruner v. Baker*, 506 F.3d 1021, 1025 (10th Cir. 2007)). Furthermore, "mere conclusory allegations are insufficient to establish an issue of fact under Fed. R. Civ. P. 56." *Barber*, 562 F.3d at 1228.

## III.  DISCUSSION

### A.  Trade Dress Infringement

A trade dress infringement claim requires that a plaintiff demonstrate: "(1) The trade dress is inherently distinctive or has become distinctive through secondary meaning; (2) There is a likelihood of confusion among consumers as to the source of the competing products; and (3) The trade dress is nonfunctional." *Gen. Motors Corp. v. Urb. Gorilla, LLC*, 500 F.3d 1222, 1227 (10th Cir. 2007) (citing *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 977 (10th Cir. 2002)).

Plaintiff's third cause of action, trade dress infringement, relies on Plaintiff's assertion that it has a protectible interest in its "unique" Slastix trade dress and that "[b]y using resistance bands crinkled in orange and black sheaths and black attachments with orange accents, Defendants' [products] use a trade dress that is essentially identical" to Plaintiff's product (ECF 2 at 34). In the Motion, Defendants assert that Plaintiff cannot demonstrate any of the three elements of a trade dress claim (ECF 117 at 17). But Defendants assert that the court need not reach the issue of secondary meaning, likelihood of confusion, and functionality because Plaintiff has not "sufficiently defined" its trade dress (*id.*). The court addresses each argument in turn.

### 1.  *Description of Plaintiff's trade dress*

Before reaching the three elements of a trade dress claim, a plaintiff must first satisfy the threshold requirement of "articulat[ing] the design elements that compose the trade dress." *Hammerton, Inc. v. Heisterman*, No. 2:06-cv-00806 TS, 2008 WL 2004327, at *3 (D. Utah May 9, 2008) (quoting *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 116 (2d Cir. 2001)). Such description is necessary because a jury would be unable to reach the relevant issues if they do not know "precisely what the plaintiff is trying to protect" and courts would be "unable to shape narrowly-tailored relief if they do not know what distinctive combination of ingredients deserves

protection." *Id.* (quoting *Yurman Design*, 262 F.3d at 117). According to Defendants, Plaintiff has not provided a description of its trade dress with enough specificity to satisfy this prerequisite to its claim (ECF 117 at 17).

Regarding the design elements of the trade dress, Defendants first point to Plaintiff's description in the Complaint which describes their trade dress as "a. Elastic bands inside of crinkled orange and black sheaths. b. Straps, clips, cuffs, loops, and/or handles that attach to said elastic bands, which are dressed in the color black with orange accents" (ECF 117 at 18). Defendants then argue that Plaintiff's "vague and overbroad definition of its trade dress will not allow the jury to know what exactly [Plaintiff] is trying to protect, and merely describes a genus of sleeved elastic bands of which [Plaintiff's] product is merely a species" (*id.*). To that point, Defendants further assert that "throughout the years," Plaintiff's description of its trade dress has changed, and in support of this position Defendants reference other lawsuits Plaintiff has been involved in throughout the years (*id.* at 19 (referencing *Hark'n Technologies Inc. v. Today's Fitness Products, Inc., et al.*, No. 1:07-cv-00080-DAK (D. Utah))). Defendants have also provided a chart of what they describe as the "ever-evolving" definitions of Plaintiff's "orange trade dress," which they argue shows that Plaintiff has been unable to provide a "stable definition" of its trade dress (ECF 148 at 7). This inability to pinpoint a precise description of the trade dress, according to Defendants, prevents a court from shaping any narrowly-tailored relief that might be necessary, and makes it impossible for "a competitor to know what new designs would be subject to challenge by the trade dress holder" (*id.* at 8 (quoting *Forney Indus., Inc. v. Daco of Missouri, Inc.*, 835 F.3d 1238, 1252 (10th Cir. 2016))).

The court does not disagree with Defendants that Plaintiff's description of its trade dress has changed over time or that there are certain inconsistencies that are prevalent when comparing

the descriptions contained in the various lawsuits that have been filed. However, even considering these inconsistences, the court finds that Plaintiff has asserted and provided some evidence to demonstrate that, since 2012, it has used the orange trade dress as described in the Complaint in relation to its STROOPS products (ECF 144 at 35; ECF 145-1).

Upon review of the trade dress description in the Complaint, along with the other descriptions that Plaintiff has used throughout this litigation, the court finds that the inconsistencies pointed out by Defendants do not prevent the court from being able to ascertain the design elements that comprise the alleged trade dress in this matter. Accordingly, the court determines that Plaintiff has satisfied its threshold requirement of articulating with sufficient specificity the design of its trade dress.

2.  *Secondary Meaning*

Now that the court has determined that Plaintiff has satisfied its preliminary requirement of describing its trade dress with sufficient detail, the court turns to the three elements of a trade dress claim, beginning with secondary meaning. "Whether a trade dress has acquired secondary meaning is a question of fact and thus generally should not be decided at the summary judgment stage." *Sally Beauty*, 304 F.3d at 978. Defendants argue that Plaintiff cannot meet this element of a trade dress claim because there is "no direct evidence showing secondary meaning," and "there is no actual consumer confusion" (ECF 117 at 39). Direct evidence however is not a prerequisite to demonstrate secondary meaning and, based on the arguments presented, the court finds that Plaintiff has demonstrated that there is question of fact related to secondary meaning such that this is an issue that should be resolved by a jury.

To demonstrate that a trade dress has acquired secondary meaning a party may rely on circumstantial evidence, including:

(1) the length and manner of the trade dress's use; (2) the nature and extent of advertising and promotion of the trade dress; (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the trade dress and a particular product; (4) actual consumer confusion; (5) proof of intentional copying; or (6) evidence of sales volume.

*Kodiak Cakes LLC v. Cont'l Mills, Inc.*, 358 F. Supp. 3d 1219, 1229 (D. Utah 2019) (citing *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1148 (10th Cir. 2016)).

In this matter, Plaintiff has provided evidence that goes to the length of time it has used the orange trade dress, along with evidence related to its sales (ECF 120-11 at 8). According to Plaintiff, since 2012 it has "sold approximately 273,600 units of sheathed elastics bearing the asserted orange trade dress having a sales value of approximately $7 million" (*id.*). The record also reflects images from Plaintiff's advertising of the orange trade dress (ECF 120-9; ECF 120-10), which provides some insight into the nature and extent of Plaintiff's advertising of the alleged trade dress.

Further circumstantial evidence related to another relevant factor, "proof of intentional copying," comes from Defendants' communications with Ideal Joy (ECF 122-4). Of particular note are those conversations which reveal that Defendants sent Plaintiff's prototypes to Ideal Joy as samples for the bands that Defendants wanted Ideal Joy to manufacturer for them (*id.* at 8–17). Plaintiff avers that these communications with Ideal Joy amount to unequivocal evidence that Defendants intentionally copied its trade dress (ECF 144 at 37–40). The court agrees that these communications certainly could lead a jury to conclude that Defendants intentionally copied Plaintiff's products but at this point in the proceedings the court need not reach any definite conclusion on this point. It is enough at the summary judgment stage that Plaintiff has pointed the court to places in the record that demonstrate there is a dispute of fact related to this issue.

While one category of evidence related to the relevant factors, such as proof of intentional copying, may not by itself demonstrate that a product has acquired a second meaning,

the Tenth Circuit has advised that under certain circumstances the confluence of two or more categories of such evidence may create a genuine issue of material fact sufficient to send the issue to a jury. *See, e.g.*, *Sally Beauty*, 304 F.3d at 978. This is not a hard and fast rule, and the court acknowledges that there have been instances where evidence related to two of the relevant factors, "significant sales and intentional copying," have "fail[ed] to create a genuine issue of material fact" related to a trade dress's secondary meaning. *See Craft Smith*, 969 F.3d at 1110.

In the present matter, the court finds that there is at least some evidence from which the factfinder could determine the existence of four of the relevant factors for secondary meaning: the length and manner of the trade dress's use, the nature of Plaintiff's advertising, Defendant's copying of the trade dress, and sales volume. Yet, despite this circumstantial evidence, Defendants still maintain there is no genuine issue of fact related to secondary meaning because each piece of evidence relied on by Plaintiff either has credibility issues or is not pertinent to the matter at hand (ECF 148 at 14–19). This argument is unpersuasive at this stage in the proceedings as "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," and should not be made in ruling on a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court agrees that each piece of evidence if considered in isolation might not be sufficient to demonstrate secondary meaning, and further notes that Defendants have raised some legitimate concerns related to the credibility and reliability of the evidence, but those are insufficient bases on which to grant Defendants' Motion. At the summary judgment stage the court's role is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

Upon consideration of the parties' arguments and drawing all reasonable inferences in the light most favorable to Plaintiff, the court finds that there are genuine issues of fact related to the question of whether Plaintiff's trade dress has become distinctive through secondary meaning.

### 3.  *Consumer Confusion*

The second element of a trade dress claim looks to the "likelihood of confusion among consumers as to the source of the competing products." *Gen. Motors Corp.*, 500 F.3d at 1227. Similar to the question of secondary meaning, "[i]n this circuit, likelihood of confusion is a question of fact." *Id.* "In determining whether a likelihood of confusion exists," various factors may be considered including:

> (1) the degree of similarity between the products; (2) the intent of the alleged infringer in designing its product; (3) evidence of actual confusion; (4) similarity in how the products are marketed; (5) the degree of care likely to be exercised by purchasers; and (6) the strength of the trade dress.

*Id.* (citing *Sally Beauty*, 304 F.3d at 972, 979).

Starting with "the degree of similarity between the products," the court notes that, based on a visual comparison of the images of the products (*see* ECF 144 at 43), there are many similarities between Orange Whip's and Hark'n's products. Even Defendants agree that "both products are generally orange and black," but Defendants point out that Plaintiff's "sleeved band is a darker shade of orange, and it includes a black line running down the length of the band" (ECF 117 at 43). There are undeniably differences between the products, although some might describe them as subtle, but any such distinctions go toward the weight of this evidence and do not suggest that the court should conclude out of hand that no likelihood of confusion exists. Thus, with regard to the degree of similarities between the two products, the court finds that this factor tilts in Plaintiff's favor.

The next factor the court considers is the intent of the alleged infringer in designing its product. As discussed above, there is evidence which supports Plaintiff's position related to Defendants' alleged intent in copying Plaintiff's product. *See supra* Part III.A.2. Defendants' communications with Ideal Joy could lead a jury to conclude that Defendants intended to copy Plaintiff's products, particularly considering that Defendants sent Plaintiff's prototypes to Ideal Joy as samples of the products Defendants were seeking to be manufactured (ECF 122-4 at 7–20). Again, the court is not concluding that Defendants acted with such intent, but at this stage the court must draw all reasonable inferences from the evidence "in the light most favorable to the non-moving party." *Barber*, 562 F.3d at 1228. In applying that standard to the evidence, the court finds that a reasonable inference could be drawn that Defendants intended to copy Plaintiff's product.

Next, the court considers the strength of the trade dress. When assessing the "conceptual strength," of a trade dress, there are five general categories that range from least to most distinctive: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful. *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1152 (10th Cir. 2013) (citing *Sally Beauty*, 304 F.3d at 975–76). Plaintiff argues its orange trade dress is "arbitrary" because "Plaintiff could have chosen any other color or combination of colors on the spectrum, but they chose an orange sheathing and orange and black accessories and handle" (ECF 144 at 45). In their reply, Defendants posit that "[o]range and black are basic, standard colors" and that "Plaintiff does not even attempt to specify a shade of orange or black" (ECF 148 at 9). These arguments again are fact based and reaching a conclusion in favor of Defendants on this point would require the court to weigh the evidence. Here, the court finds that Plaintiff has at the very least demonstrated that there is evidence to support its position that its trade dress is not generic and that this issue is better left to the purview of the jury.

The court finds that Plaintiff has demonstrated that there is evidence supporting at least three of the relevant factors to be considered when evaluating consumer confusion. And, in viewing each inference drawn from this evidence in a light most favorable to Plaintiff, the court agrees with Plaintiff that there is genuine issue of fact related to consumer confusion.

### 4.  Functionality

Finally, the court turns to functionality, the last element of a trade dress claim. "Whether a product feature is functional is a factual finding." *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 520 (10th Cir. 1987). As noted by the Tenth Circuit, "the question of whether the feature is functional should turn on whether 'the protection of the configuration would hinder competition or impinge upon the rights of others to compete effectively in the sale of goods.'" *Id.* at 519 (quoting *Sno-Wizard Mfg., Inc. v. Eisemann Prods. Co.*, 791 F.2d 423, 426 n.3 (5th Cir. 1986)).

This inquiry is a holistic one, requiring the factfinder to assess functionality of the trade dress in its entirety rather than considering the individual features of the trade dress in isolation. *Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1272 (10th Cir. 1988) ("[T]he appropriate inquiry is not whether each individual feature of the trade dress is functional but whether the whole collection of features, taken together, is functional."). In other words, "[a] combination of features may be nonfunctional and thus protectable, even though the combination includes functional features." *Id.* But as the Tenth Circuit has made clear, if the feature or combination of features of a trade dress "must be slavishly copied in order to have an equally functional product, then the feature [or combination thereof] is not entitled to protection." *Brunswick*, 832 F.2d at 519.

In the Motion, Defendants argue that even the "aesthetic" of the alleged trade dress is functional because "requiring competitors to avoid the overall shape and colors offered by

[Plaintiff] would put competitors at a disadvantage" (ECF 117 at 27). Defendants assert that "[b]right colors make the band more visible and the black sheath helps to hide dirt" (*id.* at 37).[5] Just as the court did in *Hark'n Techs., Inc. v. Today's Fitness Prods., Inc.*, No. 1:07-cv-00080 PGC, 2007 WL 2668878 (D. Utah Sept. 6, 2007), this court finds Defendants' argument connecting functionality of the bands to the color scheme of the alleged trade dress unavailing.

In *Today's Fitness*—a case that Defendants referenced in the Motion (ECF 117 at 19) and that shares a common plaintiff to the matter at hand—the court had an opportunity to examine Hark'n's alleged trade dress and render a preliminary decision related to functionally. 2007 WL 2668878 at *2. As previously noted, Hark'n's description of its trade dress may have changed over time but in *Today's Fitness* it appears that the alleged trade dress included the same black sleeve as the product in this matter. *Id.* In ruling on a motion for a preliminary injunction, the court was "persuaded the black sleeve is not functional." *Id.* In support of this finding, the court noted the black sleeve is "not essential to the use or purpose of the product, will have a marginal effect of showing dirt, and there is no indication that it affects the cost." *Id.* Here, the court finds that the same reasoning applies to the orange and black color scheme used by Plaintiff. And in following that same reasoning, the court finds Defendants' argument that Plaintiff's use of the color orange is functional because "[b]right colors make the band more visible" unpersuasive. There are, of course, bright colors other than orange that Plaintiff could have chosen but didn't. It chose orange.

---

[5] Defendants also argue that, because orange is "just one of many colors of sheaths offered to customers" by Plaintiff, that "the orange sheath aesthetically serves just one purpose—customer preference" and could "not possibly be offered for the purpose of branding" because Plaintiff "offers the same band" in just about "any color" (ECF 117 at 37–38). While it may be true that Plaintiff has offered these bands in different colors, and sells its Slastix bands through different brand names, the matter presently before the court is only about the alleged orange and black trade dress. Plaintiff presented evidence related to the sales of the asserted orange trade dress since 2012 (ECF 120-11 at 8) and has shown that it has used the orange and black color scheme exclusively for the selling of it STROOPS products (ECF 120-9; ECF 120-10). Based on this evidence, and the allegations in the Complaint describing the orange and black products, the court does not find the fact that Plaintiff, at various times through different brands, has offered these bands in a range of colors to be pertinent to its analysis related to the narrow issue of functionality in its summary judgment ruling.

Because the use of orange is "not essential to the use or purpose of the product," has a marginal effect on making the band more visible, "and there is no indication that it affects the cost," the court finds it is a nonfunctional feature of the product at issue. *See id.*

In the Motion, Defendants also focus on the individual features of Plaintiff's alleged trade dress, arguing that each feature is functional, and a combination of these features is functional (ECF 117 at 26–38). Defendants state that "the utility patent, the combination of the crinkle sheath, buckles, straps, and connectors makes the bands safer and useful" all of which demonstrates that the trades dress is functional (*id.* at 27). In response to this argument, Plaintiff states that Defendants' tactic of breaking down the individual elements of the trade dress and "then attacking certain of those elements as functional" is an approach that was rejected by the Tenth Circuit in the matter *Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268 (10th Cir. 1988) (ECF 144 at 46). Indeed, in *Hartford House*, the court noted that breaking down the elements of the trade dress in such a way "misconceives the scope of the appropriate inquiry." 846 F.2d at 1272.

More to this point, in *Today's Fitness*, the court further determined that Hark'n's alleged trade dress was "a composite of the several features," and the court was "satisfied that these combined features are not functional but serve to identify the Hark'n product." 2007 WL 2668878, at *2. This is not surprising given that "virtually every product is a combination of functional and non-functional features" which is also why "a rule denying protection to any combination of features including a functional one would emasculate the law of trade dress infringement." *Hartford House*, 846 F.2d at 1272 (quoting *Am. Greetings Corp. v. Dan-Dee Imports, Inc.*, 807 F.2d 1136, 1143 (3d Cir. 1986)).

Here, even if the court did find there were individual features of Plaintiff's alleged trade dress that were functional, the evaluation of whether the combination of said features "must be

slavishly copied in order [for a competitor] to have an equally functional product," is a question better left for the jury. *See Brunswick*, 832 F.2d at 519. The court therefore finds that there is a genuine issue of material fact related to the functionality of Plaintiff's alleged trade dress.

Based on the foregoing, the court finds that Plaintiff has sufficiently articulated the elements of its alleged trade dress and there are material issues of fact related to secondary meaning, consumer confusion, and functionality. The court therefore DENIES Defendants' Motion related to Plaintiff's third cause of action for trade dress infringement.

## B.  False Designation of Origin

Next, the court turns to Plaintiff's fourth cause of action for false designation of origin (ECF 2 at 36). "False designation of origin claims fall into two categories: 'passing off,' where a party represents his or her own goods or services as someone else's or 'reverse passing off,' where a party misrepresents someone else's goods or services as his or her own." *John Bean Techs. Corp. v. B GSE Grp., LLC*, 480 F. Supp. 3d 1274, 1303–04 (D. Utah 2020) (citing *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27 n.1 (2003)).

In the Complaint, Plaintiff alleges that Defendants use an "infringing trade dress confusingly similar to Hark'n Tech's Slastix Trade Dress" (ECF 2 at 36). Additionally, Plaintiff alleges that Defendants have used its "STROOPS" mark in a manner that is "likely to cause confusion, mistake, or deception as to the affiliation or connection of Orange Whip" with Plaintiff "as to the origin, sponsorship, association, [or] approval" of Orange Whip's products (*id.* at 36–37). In the Motion, Defendants assert that Plaintiff's false designation of origin claim falls into the "reverse passing off" category (ECF 117 at 53). Based on the Complaint, and Plaintiff's apparent

concession in response to the Motion,[6] the court agrees with Defendants that Plaintiff is only asserting a reverse passing off claim.

As the court noted in *John Bean Technologies Corp. v. B GSE Group, LLC*, 480 F. Supp. 3d 1274 (D. Utah 2020), "the Tenth Circuit has yet to rule substantively on a reverse passing off claim," and therefore "has not established what elements a plaintiff need demonstrate to succeed on this kind of Lanham Act violation." *Id.* at 1304. The court therefore applied a test recommended by the parties and that been "adopted by the Second, Fourth, and Federal Circuits." *Id.* In this case, Defendants maintain the test utilized by the court in *John Bean* should be applied here, and Plaintiff raised no argument to the contrary. Under *John Bean*, a reverse passing off claim requires that a plaintiff establish the following elements: "(1) that the work at issue originated with the plaintiff; (2) that origin of the work was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin.'" *Id.* (quoting *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 438 (4th Cir. 2010)). An example of "reverse passing off" would be "Reebok acquiring Nike's shoes, replacing the swoosh with Reebok's vector logo, and selling the shoes as if Reebok produced them." *Id.*

Now that the court has determined the appropriate analysis to apply, it turns to the facts of the present case. While it is not entirely clear, Plaintiff's false designation of origin claim appears to apply to two different categories of products sold by Defendants. The first is the 106 preliminary kits that Defendants purchased from Plaintiff and then resold to their customers. The

---

[6] In response to the Motion, Plaintiff did not explicitly agree with Defendants that it is solely asserting a "reverse passing off" claim but Plaintiff also made no attempt to clarify or otherwise dispute Defendants' categorization of its false designation claim. Specifically, the court notes that Plaintiff never argued that it is asserting a "passing off" claim and, in its response, Plaintiff only addresses those elements relevant to a reverse passing off claim (ECF 144 at 49–50). The court therefore finds that any argument Plaintiff may have had that it is instead asserting a "passing off" claim is waived. *See Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768–69 (10th Cir. 2001) (finding that a party has waived an argument by failing to raise it in response to a motion for summary judgment).

second relates to any of the products that Defendants commissioned to be manufactured by a third party, such as Ideal Joy. The court addresses each category in turn.

1.  *The 106 Preliminary Kits*

It is undisputed that Defendants bought 106 preliminary kits from Plaintiff, the kits contained products bearing the "STROOPS" mark, and Defendants then resold the kits to their customers. Plaintiff can therefore satisfy the first element of a reverse passing off claim: that these items "originated" with Plaintiff.

The second element however requires that Plaintiff demonstrate that the "origin of the work was falsely designated" by Defendants. But Plaintiff has not pointed the court to anywhere in the record that suggests that the origin of these prototypes was ever "falsely designated" by Defendants. In other words, there is no evidence that Defendants removed the STROOPS mark from any product that originated from Plaintiff and replaced it with their own mark. Plaintiff's inability to demonstrate the second element of its claim related to the 106 preliminary kits is fatal to its false designation of origin claim.

As stated above, the initial burden of demonstrating that there is no genuine issue of material fact such that they are entitled to judgment as a matter of law is on Defendants. *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016). "A movant who does not bear the burden of persuasion at trial may satisfy this burden 'by pointing out to the court a lack of evidence on an essential element of the nonmovant's claim.'" *Id.* (quoting *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007)). "If the movant meets this initial burden, the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant." *Id.* (quoting *Libertarian Party of N.M.*, 506 F.3d at 1309).

In this matter, Defendants have satisfied their initial burden of pointing out that there is a lack of evidence related to key elements of Plaintiff's false designation claim. The burden thus shifts to Plaintiff to set forth specific facts from which the jury could find that Defendants falsely designated these 106 kits. While it is possible that amongst the hundreds of pages of exhibits related to the Motion there exists facts to support Plaintiff's claim the court is not required to "go beyond the referenced portions of these materials" even though it has the discretion to do so. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998). Thus, if there are any additional facts from the record that could support Plaintiff's claim it was Plaintiff's duty to point the court to the relevant cites.

Because Plaintiff has not directed the court to anywhere in the record that contains facts to support all four elements of a reverse passing off claim, the court finds that its false designation of origin claim related to the 106 preliminary kits fails. Defendants' Motion is therefore granted with respect to these items.

### 2. Products Manufactured by a Third Party

Beyond the 106 preliminary kits, Plaintiff's false designation claim also appears to incorporate products that Defendants commissioned from other manufacturers (ECF 2 at 36–38). Defendants assert that these products did not originate with Plaintiff thus Plaintiff cannot satisfy the first element of a reverse passing off claim (ECF 117 at 53–54). For the following reasons, the court agrees with Defendants.

Notwithstanding the fact that these products were not manufactured by Plaintiff, nor do they bear the STROOPS mark, Plaintiff maintains that Defendants' use of its alleged trade dress can also suffice as its basis for its false designation claim (ECF 144 at 50; ECF 157). On comparing a trade dress infringement claim with a false designation of origin claim, the court is not convinced

that these causes of action overlap to the extent argued by Plaintiff. Both false designation of origin and trade dress infringement relate to consumers being misled, however, trade dress infringement focuses on the visual appearance of a product while false designation of origin has a focus on the physical source of a product. *Compare Gen. Motors Corp.*, 500 F.3d at 1227 (discussing the elements of a trade dress infringement claim), *with John Bean*, 480 F. Supp. 3d at 1304 (relaying the relevant elements of a false designation of origin claim).

During oral argument, Plaintiff expounded on this argument and the question of whether a false designation claim may rest entirely on a trade dress claim was vigorously debated (ECF 157). Neither party however could direct the court to any case law that was directly on point related to this issue (*id.*). Because this issue had not been fully briefed, the court gave the parties an opportunity to provide supplemental briefing with additional case law that might provide guidance on this point (*id.*). After review of this additional case law, the court has determined that Plaintiff's trade dress infringement claim, as alleged in the Complaint, is not sufficient to support its false designation of origin claim.

Of the cases provided in the supplemental briefing, the court found *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), included in Defendants' supplement briefing (ECF 159), particularly helpful. In *Dastar*, the United States Supreme Court undertook the task of "decid[ing] what § 43(a)(1)(A) of the Lanham Act means by the 'origin' of 'goods.'" *Id.* at 31. The court found that "the most natural understanding of the 'origin' of 'goods'—the source of wares—is the producer of the tangible product sold in the marketplace." *Id.* Thus, the phrase "origin of goods," under the Lanham Act "refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." *Id.* at 37. "Reading 'origin' in § 43(a) [of the Lanham Act] to require attribution of

uncopyrighted materials would pose serious practical problems." *Id.* at 35. In applying the *Dastar* court's reasoning to this matter the court finds that, without more, the facts supporting Plaintiff's trade dress claim do not simultaneously establish that the products Defendants manufactured through a third party "originated" with Plaintiff for purposes of a false designation claim under the Lanham Act.

This is also consistent with the court's finding in *John Bean* that "[i]f the defendant supplies a product it manufactured, even if copied from a competitor, a reverse passing off claim generally will not attach." 480 F. Supp. 3d at 1306; *accord Kehoe Component Sales Inc. v. Best Lighting Prods., Inc.*, 796 F.3d 576, 587 (6th Cir. 2015) ("In this case, it is undisputed that [the defendant] manufactured the tangible cloned objects that it represented as having manufactured. The undisputed facts thus show that [the defendant] never made a false designation of the products' 'origin' within the meaning of § 43(a). [The defendant] represented that the cloned products originated with [the defendant]; and even though the ideas and initial design may well have originated with [the plaintiff], the tangible products themselves did not."). That is precisely the situation here where Defendants commissioned a third party to manufacture these products which Plaintiff maintains are copies of its own products. Other than its assertions that Defendants copied its products, and that the design originated with Plaintiff, Plaintiff has not pointed the court to anywhere else in the record that demonstrates Defendants falsely designated the origin of these products within the meaning of a Lanham Act violation.

Another point for which Plaintiff provided more clarity on during oral argument relates to Defendants' promotional videos, that apparently included STROOPS' products, which Plaintiff maintains Defendants used to sell their own line of products that were made by Ideal Joy (ECF 157). This argument appears to be more akin to a "passing off" claim, *John Bean*, 480 F. Supp. 3d

at 1304 ("To illustrate, passing off could include Reebok removing its distinctive 'vector' logo from its own shoes and replacing it with Nike's 'swoosh.'"), rather than a "reverse passing off" claim. And, as previously noted, Plaintiff has waived any passing off claim by not arguing as much in its opposition to the Motion. *See supra* note 6.

Yet, even if the court were to find that Plaintiff had not waived a passing off claim, the record cites relied on by Plaintiff related to the promotional videos would still be insufficient to demonstrate the elements of its claim. "To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). To the court's knowledge, the videos themselves are not in evidence and, if they were, Plaintiff did not provide these videos to the court in response to the Motion. No timeline was provided to the court to demonstrate when these videos were displayed, nor is it clear who posted the videos, or whether they were used to sell anything other than the 106 preliminary kits.

The only record citations relied on by Plaintiff related to these promotional videos, come from two parts of Harker's testimony (ECF 144 at 50). The first began with a question to Harker about whether he knew "if Orange Whip ever advertised [a] connection with STROOPS after the first half of the year of 2019, after July of 2019" (ECF 120-6 at 130). Harker stated that he knew "they had ads up or they had YouTube videos up that were still out in the public" (*id.*). When followed up with a question of whether Defendants were "advertising STROOPS," Harker responded he "[didn't] know what they were doing" (*id.* at 131). And when asked whether "the products in those images were prototypes," Harker stated that he "[didn't] know exactly which ones they used," and he was "not sure" that he could say "that they were STROOPS products" (*id.*). This line of questioning and Harker's responses do not demonstrate, as Plaintiff suggests,

that Defendants used STROOPS products in their advertising to sell products manufactured from a third-party. At best, Harker testified the videos "were still out in the public," but that hardly provides any sort of timeline whereby any connections could be made related to the use of these videos. What's more, Harker testified he was unaware of what products Defendants used in the videos and could not say whether STROOPS' products were being used to sell anything other than the 106 preliminary kits.

The second record citation to Harker's testimony that Plaintiff relies on begins with Plaintiff's counsel asking Harker when was "the most recent time that [he] viewed" the video promoting "both the STROOPS brand" and Orange Whip's products (*id.* at 167). Harker responded, "Yesterday" (*id.*). Harker then confirmed that the video "audibly promote[s] both STROOPS and Orange Whip" (*id.*). That line of questioning however ended there, with counsel turning instead to an email exchange between Harker, Wald, and Newman (*id.*). No additional follow-up questions were asked about the video that Harker had viewed. It is therefore unknown whether the video had been previously downloaded or if it was still available to the public and, more importantly, if the video was actively being used at that time to sell Defendants' products that had been manufactured by a third party. This evidence is thus ineffective at overcoming a grant of summary judgment, as courts have held that the nonmoving party may not rely on conclusory and self-serving assertions. *See Breedlove v. Costner*, 405 F. App'x 338, 342 (10th Cir. 2010) (affirming grant of summary judgment to defendants where plaintiff "offered only his conclusory and self-serving statements, failing to cite any specific instances" in support of his claim).

Defendants have demonstrated that there is a lack of evidence related to Plaintiff's false designation claim and the products manufactured by a third-party. For this claim to survive

summary judgment, Plaintiff had to "set forth specific facts from which a rational trier of fact could find for the nonmovant." *Savant Homes*, 809 F.3d at 1137 (quoting *Libertarian Party of N.M.*, 506 F.3d at 1309). Moreover, the evidence relied on by Plaintiff "must be based on more than mere speculation, conjecture, or surmise." *Bones*, 366 F.3d at 875. Plaintiff has not set forth specific facts that would support its false designation claim related to these additional products and the evidence Plaintiff has pointed to is speculative and conclusory.

For the aforementioned reasons, the courts finds that there is no genuine issue of material fact related to Plaintiff's false designation of origin claim and Defendants' Motion is granted with respect to Plaintiff's fourth cause of action.

## C. Trademark Infringement

A trademark infringement claim requires that the plaintiff demonstrate: "(1) that the plaintiff has a protectable interest in the mark; (2) that the defendant has used an identical or similar mark in commerce; and (3) that the defendant's use is likely to confuse consumers." *John Bean*, 480 F. Supp. 3d at 1313–14 (quoting *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1238 (10th Cir. 2013)).

Plaintiff's fifth cause of action is for trademark infringement (ECF 2 at 38). With respect to that claim, Plaintiff asserts that it "owns the federal trademark registration for STROOPS" and "Defendants have used and continue to use the STROOPS mark in connection with their [products] without [Plaintiff's] consent or authorization" (*id.*). In the Motion, Defendants assert that "Orange Whip is protected from [Plaintiff's] claims for trademark infringement under the first sale doctrine" and "no evidence exists or has been produced that shows Orange Whip used any marks resembling the 'Stroops' mark" to sell its products (ECF 117 at 51–52). Similar to Plaintiff's false designation of origin claim, its trademark infringement claim appears to be asserted against the

two different categories of products sold by Defendants: (1) the 106 preliminary kits that Defendants purchased from Plaintiff and resold to their customers, and (2) the products that Defendants commissioned to be manufactured by a third party, such as Ideal Joy.

### 1. *The 106 Preliminary Kits*

According to Defendants, the first sale doctrine applies to the 106 preliminary kits and therefore they cannot be liable for trademark infringement for the resale of these items (ECF 117 at 51). "Under the first sale doctrine, 'the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product.'" *Skullcandy, Inc. v. Filter USA, Inc.*, No. 2:18-cv-00748-DAK, 2019 WL 2568010, at *4 (D. Utah June 21, 2019) (quoting *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1240–41 (10th Cir. 2006)). Thus, "'[t]hose who resell genuine trademarked products are . . . not liable for trademark infringement' because 'trademark law is designed to prevent sellers from confusing or deceiving consumers about the origin or make of a product, which confusion ordinarily does not exist when a genuine article bearing a true mark is sold.'" *Id.* (quoting *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1071 (10th Cir. 2009)). This doctrine is inapplicable however if the company "sells trademarked goods that are materially different than those sold by the trademark owner," and the seller may be liable for trademark infringement because "[a] materially different product is not genuine and may generate consumer confusion about the source and the quality of the trademarked product." *Id.* (quoting *Beltronics*, 562 F.3d at 1072).

The first sale doctrine applies to the 106 kits, according to Defendants, because the products came directly from Plaintiff, they bore the "Stroops" mark, Defendants did not alter those products in any way, and they "resold those genuine articles bearing the 'Stroops' mark" (ECF 117 at 51–52). Plaintiff, on the other hand, asserts the first sale doctrine is inapplicable to these

products because Defendants "combined" their own products with Plaintiff's products "to create a totally new and materially different product, the 'Power Peel Package'" (ECF 144 at 49). In support of its position that Defendants created a "materially different product," Plaintiff relies on its allegation in the Complaint that describes what Defendants included in its "Power Peel Package" (*id.*; ECF 2 at 20). This paragraph cited to in the Complaint however does not demonstrate that packaging a product along with other items creates a "materially different product." Moreover, the allegations in the Complaint are insufficient for Plaintiff to rely on to avoid the entry of summary judgment on its claim. *See Anderson*, 477 U.S. at 256 ("[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."); *see also Conaway v. Smith*, 853 F.2d 789, 792 n.4 (10th Cir. 1988) ("[A] nonmoving party may not rely merely on the unsupported or conclusory allegations contained in pleadings to rebut the movant's factual proof in support of the motion for summary judgment.").

Further in support of its argument that the first sale doctrine is inapplicable, Plaintiff references Defendants' "training videos and coaching certifications" (ECF 144 at 49). But Plaintiff has provided no citations to the record regarding such evidence and as stated above, *see supra* Part III.B.2., if these videos were produced during discovery they were not provided to the court by either party for purposes of ruling on the Motion. The court thus has no way of knowing whether these videos support Plaintiff's position.

Based on the evidence and arguments presented related to the Motion, the court finds that the first sale doctrine applies to the 106 preliminary kits bearing the STROOPS mark that Defendants resold to its customers. Plaintiff's trademark infringement claim related to those products therefore fails.

### 2. Products Manufactured by a Third Party

Plaintiff also attempts to extend its trademark infringement claim to items beyond the 106 kits, to products that were manufactured through another source and that did not bear the STROOPS mark (ECF 144 at 48–49). According to Plaintiff, its trademark infringement claim applies to those products because Defendants sold these "third-party supplied products through videos and ads that still included the Stroops mark" (*id.* at 48). On this point, Plaintiff provided no citations to the record to support its position that these promotional videos were used for anything other than to sell the 106 kits and, as the court has already noted, the videos themselves were not provided in response to the Motion. *See supra* Part III.B.2.

The other record citations provided by Plaintiff are to Harker's testimony related to his perceptions of the promotional videos allegedly posted by Defendants (ECF 144 at 48). As the court has already discussed at some length, Harker's testimony related to these videos is far from helpful, and his statement that he "[knew] they had ads up or they had YouTube videos up that were still out in the public" (ECF 120-6 at 130), does not create a connection between Plaintiff's protected STROOPS mark and any third party products being sold by Defendants. Particularly when that is combined with Harker's admission, when asked whether Defendants were "advertising STROOPS," that he "[didn't] know what they were doing" and he was "not sure" that he could say whether they "were STROOPS products" or not (*id.* at 131). When considering a motion for summary judgment, "[t]he mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is 'genuine.'" *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997). Considering the evidence relied on by Plaintiff, the court does not find that it is sufficient to create a genuine dispute of fact related to the sale of the third party products.

The court therefore determines (1) that the first sale doctrine applies to the 106 preliminary kits that Defendants bought from Plaintiff and resold to its customers, and (2) that there is no evidence demonstrating that Defendants used the STROOPS mark to sell products that were created by a third party. Accordingly, the court grants Defendants' Motion with regard to Plaintiff's fifth cause of action for trademark infringement.

### D.  Unfair Competition Under Utah Law

"Utah law provides statutory and common law causes of action for unfair competition." *Big Squid, Inc. v. Domo, Inc.*, No. 2:19-cv-193, 2019 WL 3555509, at *10 (D. Utah Aug. 5, 2019). Plaintiff's sixth and seventh claims for relief assert a statutory and common law unfair competition claim (ECF 2 at 40–42). The court addresses each in turn.

### 1.  *Unfair Competition under Utah Code § 13-5a-101*

Plaintiff's statutory unfair competition claim is brought pursuant to Utah Code § 13-5a-101 *et seq.* (ECF 2 at 40). The Utah Code defines "unfair competition" as:

[A]n intentional business act or practice that:
  (i)   (A) is unlawful, unfair, or fraudulent; and
        (B) leads to a material diminution in value of intellectual property; and
  (ii) is one of the following:
        (A) malicious cyber activity;
        (B) infringement of a patent, trademark, or trade name;
        (C) a software license violation; or
        (D) predatory hiring practices.

Utah Code § 13-5a-102(4)(a). Of the intentional business acts or practices listed under the statute, the only conduct that Plaintiff has alleged that Defendants have engaged in is infringement of a trademark (ECF 2 at 40–41). As noted above, the court has determined that there is no genuine issue of disputed fact related to Plaintiff's trademark infringement claim, *see supra* Part III.C., and it therefore follows that Plaintiff's statutory unfair competition claim fails.

Plaintiff resists this conclusion, arguing that its statutory unfair competition claim is not necessarily tied to its trademark infringement claim (ECF 144 at 50; ECF 157). Specifically, Plaintiff argued that a trade dress claim is a subcategory of a trademark claim, and the unlawful business practice or conduct that Defendants engaged in was the infringement of Plaintiff's alleged trade dress (*id.*). Plaintiff however provided no case law in its briefing to support this position. Because this issue had not been fully briefed, after oral argument the court provided an opportunity for the parties to supplement their briefing with additional case law that addressed whether a trade dress claim can serve as support for a statutory unfair competition claim (*id.*). Based on the arguments of the parties, along with their supplemental briefing, the court disagrees with Plaintiff that its trade dress claim, as asserted in the Complaint, is sufficient to form a basis for its statutory unfair competition claim.

Of the additional cases provided by the parties, the court found *Diamonds Direct, L.C. v. Manly Bands*, No. 2:23-cv-00870, 2024 WL 4818827 (D. Utah Nov. 18, 2024) to be the most on point. In *Diamonds Direct*, the court was tasked with determining whether copyright infringement could form a basis for the plaintiff's statutory unfair competition claim. *Id.* at *10. The court noted that "the statute does not list copyright infringement as a possible basis for a claim, even though patent and trademark infringement are listed." *Id.* Because the Utah legislature had remained silent as to whether a copyright infringement claim could form the basis of a statutory unfair competition claim "while specifically enumerating some other forms of intellectual property infringement," the court concluded that "acts of copyright infringement are beyond the reach of the statute." *Id.*

Like the court's finding in *Diamonds Direct*, this court notes that trade dress infringement and trademark infringement are both forms of intellectual property infringement.

They are however different claims that require a plaintiff to establish different elements. *Compare Gen. Motors*, 500 F.3d at 1227 (listing elements of a trade dress claim), *with John Bean*, 480 F. Supp. 3d at 1313–14 (listing elements of a trademark infringement claim). Because the Utah legislature chose not to include "trade dress infringement" as a basis for an unfair competition claim, the court assumes that it was the intention of the legislature to place acts of trade dress infringement beyond the reach of the unfair competition statute.

Accordingly, the court finds that Plaintiff cannot succeed on its statutory unfair competition claim and grants Defendants' request that Plaintiff's sixth claim for relief be dismissed.

### 2.  *Unfair Competition Under Utah Common Law*

Plaintiff's seventh claim for relief is for unfair competition under Utah common law (ECF 2 at 41). "Under Utah common law, 'unfair competition includes—but is not limited to—passing off, palming off, imitating, and causing or likely causing confusion or deception.'" *Siskin Enterprises, Inc. v. DFTAR, LLC*, No. 2:20-cv-00304-JNP, 2021 WL 734955, at *3 (D. Utah Feb. 25, 2021) (quoting *Overstock.com, Inc. v. SmartBargains, Inc.*, 192 P.3d 858, 859–60 (Utah 2008)).

Defendants argue that Plaintiff's claim of unfair competition under Utah common law "fail[s] for the same reasons its claims under the Lanham [A]ct fail: a lack of evidence of consumer confusion" (ECF 117 at 56). In support of their argument, Defendants assert that "[t]his case fits squarely within the framework" of the Utah Supreme Court's decision from *Overstock.com, Inc. v. SmartBargains, Inc.*, 192 P.3d 858 (Utah 2008). Upon review of the *Overstock* decision however this court is not convinced the analysis therein supports dismissal of Plaintiff's common law unfair competition claim.

In *Overstock*, the plaintiff (Overstock) and defendant (SmartBargains) each sold consumer products through their online websites. *Id.* at 860. Overstock alleged "that pop-ups advertising SmartBargains unlawfully appeared when customers accessed Overstock's website and that these pop-ups were intended to," among other things, "confuse and deceive customers, trade upon Overstock's goodwill, blur Overstock's trademarks," and "dilute Overstock's trademarks' ability to identify Overstock as the source of goods and services." *Id.*

When considering what "unfair competition" consists of, the court noted that such a claim might be demonstrated when one party imitates "the wares made and sold by another for the purpose of palming off or substituting his wares for those of the other, and in that way misleading the purchaser by inducing him to buy the wares made and sold by the first instead of those by the second." *Id.* at 863. The court further noted "[i]t is enough if it be shown that there is the probability of confusion or deception." *Id.* (quoting *Hi–Land Dairyman's Ass'n. v. Cloverleaf Dairy*, 151 P.2d 710, 717 (Utah 1944)). In the end, the Utah Supreme Court agreed with the district court's analysis that "Overstock failed to show that SmartBargains' pop-ups, labeled with the SmartBargains' logo and appearing in a separate window on top of Overstock's website, are deceptive, infringe a trademark, pass off SmartBargains' goods as those of Overstock's goods, or are likely to cause confusion." *Id.*

Defendants believe the present matter is similar to that of *Overstock* because, according to Defendants, there is no evidence of "consumer confusion" (ECF 117 at 56). But, as the court previously found, there is circumstantial evidence that Plaintiff has pointed to from which a jury could conclude that there has been consumer confusion. *See supra* Part III.A.3. A lack of evidence related to consumer confusion is therefore not a sufficient justification for the court to grant Defendants' Motion with regard to this claim.

Because the court finds that there is a genuine issue of fact related to consumer confusion, Defendants' Motion with regard to Plaintiff's seventh cause of action is denied.

### E.  Misappropriation of Trade Secrets

Plaintiff's eighth and ninth claims for relief concern the misappropriation of trade secrets under state and federal law (ECF 2 at 42–46). Defendants argue that both of Plaintiff's trade secrets claims fail because there is no evidence that Plaintiff provided Defendants with a trade secret (ECF 117 at 57). On this point, the court agrees with Defendants.

Utah's Uniform Trade Secrets Act (UTSA) governs claims related to the misappropriation of trade secrets, and to prevail on such a claim a plaintiff must demonstrate: "(1) the existence of a trade secret, (2) communication of the trade secret to [defendant] under an express or implied agreement limiting disclosure of the secret, and (3) [defendant's] use of the secret that injures [plaintiff]." *Big Squid, Inc. v. Domo, Inc.*, No. 2:19-cv-193, 2019 WL 3555509, at *13 (D. Utah Aug. 5, 2019) (quoting *USA Power, LLC v. PacifiCorp*, 372 P.3d 629, 648 (Utah 2016)). To succeed on a federal misappropriation claim, brought under the Defend Trade Secrets Act (DTSA), requires that a plaintiff show: "(1) the existence of a trade secret; (2) the acquisition, use, or disclosure of the trade secret without consent; and (3) that the individual acquiring, using, or disclosing the trade secret knew or should have known the trade secret was acquired by improper means." *Big Squid*, 2019 WL 3555509, at *12 (quoting *API Americas Inc. v. Miller*, No. 2:17-CV-02617-HLT, 2019 WL 1506955, at *5 (D. Kan. Apr. 5, 2019)). Under both the UTSA and DTSA, a key element requires that the plaintiff demonstrate that a trade secret was communicated to or otherwise acquired by the defendant.

Here, with respect to what is alleged to be the trade secret, Plaintiff's position has not been entirely clear, or properly supported. In its opposition to the Motion, Plaintiff alleges it

"provided Defendants with technical engineering information through the roughly 413 research and development hours expended to develop the 'patterns, plans, compilations, designs, and prototypes' that Plaintiff shared with Defendants over a months-long process" (ECF 114 at 51). In support of this position, Plaintiff cites to two pages of Harker's deposition (*id.*). On those pages referenced by Plaintiff, Harker testified that he spent "[a]bout 413" hours on research and development, and he discussed how he calculated the "hourly rate" for that time (ECF 120-6 at 187–87). There is no discussion whatsoever in the cited testimony related to trade secrets and nothing from that citation demonstrates that "patterns, plans, compilations or designs" containing trade secrets were communicated to Defendants.

Nevertheless, it is undisputed that Harker spent time developing prototypes and prototypes were sent to Orange Whip. At the hearing on the Motion, Plaintiff argued the prototypes themselves are the trade secrets and by accepting these prototypes Defendants acquired Plaintiff's trade secrets (ECF 157). While a prototype itself could potentially constitute a trade secret, Plaintiff has not alleged facts or pointed to evidence that would support such a position regarding the prototypes given to Defendants. In fact, Harker's testimony on this point demonstrates the opposite to be true. During his deposition, Harker claimed that the "makeup" of the material used for the prototypes along with the sheath, and how the "connectors" are "configure[d]" is confidential and proprietary (ECF 120-6 at 114). However, when asked whether Harker shared "with Orange Whip any of the confidential information," Harker responded, "No" (*id.*). And when asked whether Harker shared with Defendants "any of the proprietary information," Harker again stated, "No," and "not that I recall" (*id.*). When he gave his deposition, Harker knew that Defendants had received the prototypes, yet he still maintained that confidential or proprietary

information had not been conveyed to Defendants. These admissions cut against any argument that Defendants received or otherwise obtained any trade secret belonging to Plaintiff.

Beyond these prototypes, Plaintiff's trade secrets claims also rely on the PDMA—an agreement that the parties never signed—and a provision within that agreement which states, in part, that "no license or any other right is granted to one party or any sublicensee in respect to any patent, trademark, copyright, know-how, trade secret, or other Intellectual Property rights owned by the other party" (ECF 122-3 at 22). According to Plaintiff, this provision demonstrates that Plaintiff "took efforts to maintain the secrecy of their trade secrets" (ECF 144 at 52). This boilerplate contract language however is not evidence that Plaintiff has any trade secrets nor is it evidence that any such trade secrets were ever disclosed to Defendants. The language in the PDMA, the terms of which were never agreed to by the parties (*see* ECF 160), is thus insufficient to demonstrate that Plaintiff has met the elements of it federal or state law claims related to trade secrets.

Based on the arguments raised and citations to the record relied on the by the parties, the court finds that Plaintiff has not demonstrated that a trade secret was communicated to or acquired by Defendants. There is also nothing to indicate that the act of sending Defendants the prototypes was in and of itself a communication of a trade secret, particularly considering the fact that Harker himself testified that no confidential or proprietary information was shared with Defendants. The court therefore grants Defendants' Motion with regard to Plaintiff's eighth and ninth claims for relief for the misappropriation of trade secrets under state and federal law.

## F.  Individual Claims Against Wald and Newman

Finally, the court addresses Defendants' alternative argument that Plaintiff's claims against Wald and Newman fail because their actions were conducted on behalf of Orange Whip

and no evidence exists to support piercing the corporate veil (ECF 117 at 58–59). The only two claims that have survived, relevant to the present Motion, are Plaintiff's claims for trade dress infringement and unfair competition under Utah common law. Therefore, the court need only decide whether those two claims can proceed against Wald and Newman individually.

As Defendants point out, "[t]he corporate structure is an artificial construct of the law, a substantial purpose of which is to create an incentive for investment by limiting exposure to personal liability." *N.L.R.B. v. Greater Kansas City Roofing*, 2 F.3d 1047, 1051 (10th Cir. 1993). Thus, for individuals such as Wald and Newman to be "liable on the obligations of the corporation" Plaintiff must pierce the corporate veil. *Boulder Falcon, LLC v. Brown*, 720 F. Supp. 3d 1175, 1200 (D. Utah 2024). As cautioned by the Tenth Circuit, "[c]orporate veils exist for a reason and should be pierced only reluctantly and cautiously." *Yoder v. Honeywell Inc.*, 104 F.3d 1215, 1220 (10th Cir. 1997) (quoting *Boughton v. Cotter Corp.*, 65 F.3d 823, 836 (10th Cir. 1995)).

Piercing the corporate veil under federal law and Utah law require similar showings. Under the federal common law, a plaintiff attempting to pierce the corporate veil must show (1) that there was "such unity of interest and lack of respect given to the separate identity of the corporation by its shareholders that the personalities and assets of the corporation and the individual are indistinct," and (2) that "adherence to the corporate fiction sanction a fraud, promote injustice, or lead to an evasion of legal obligations." *N.L.R.B.*, 2 F.3d at 1052. Utah law similarly requires that a party attempting to pierce the corporate veil demonstrate that (1) "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist," and (2) that "observance of the corporate form would sanction a fraud, promote injustice, or an inequitable result would follow." *Norman v. Murray First Thrift & Loan Co.*, 596 P.2d 1028, 1030 (Utah 1979).

In response to the Motion, Plaintiff does not argue that there is evidence to support piercing the corporate veil under federal or Utah law. Instead, Plaintiff argues that "courts in this circuit have rejected Defendants' argument that piercing the corporate veil is necessary to hold individuals personally liable for Lanham Act violations" (ECF 144 at 53). In support of this position Plaintiff cites to *University of Kansas v. Sinks*, 565 F. Supp. 2d 1216 (D. Kan. 2008). Upon review of the *Sinks* case, the court disagrees with Plaintiff that it stands for the proposition that the Lanham Act allows for individuals to be held liable in the manner Plaintiff asserts. Rather, the *Sinks* court looked to the principle that "when a person in a control position causes the corporation to commit a civil wrong, imposition of personal liability requires consideration of the nature of the wrong, the culpability of the act, and whether the person acted in his/her personal interest or that of the corporation." *Id.* at 1239. The individual in question, Larry Sinks (Sinks), was the "sole owner" of the defendant company, which sold apparel that displayed trademarks that were owned by the University of Kansas (KU). *Id.* at 1234, 1240. The court noted that Sinks had personally created and approved all designs of his products, and there was evidence that "he previously owned a company that was a licensee" of KU, and was later "denied a license" by KU after forming his own company. *Id.* at 1240. The evidence was sufficient, according to the court, to show that Sinks had acted in his own personal interest and "actively, and knowingly caused the alleged trademark infringement of KU's marks." *Id.* Given those facts, the court allowed KU to proceed with its claims against Sinks, without requiring KU to establish a veil piercing claim. *Id.*

The facts in *Sinks* are highly distinguishable to the ones at hand. For one, there is nothing to indicate that Wald or Newman is the "sole owner" of Orange Whip. Plaintiff points to the email communications that involve Wald and Newman, claiming that this demonstrates they "oversaw, directed, and personally participated in the infringing activity for their own benefit" (ECF 144 at

53), but unless they were the sole owners of Orange Whip, the court fails to see how any such activity was done for their individual benefit and not instead an action taken on behalf of the company.

Plaintiff's position that the Lanham Act unequivocally allows corporate officers to be held individually liable for their actions without making the requisite showing for veil-piercing is also contrary to the United States Supreme Court's recent decision in *Dewberry Group, Inc. v. Dewberry Engineers Inc.*, 145 S. Ct. 681 (2025). In *Dewberry*, it was held that courts should respect the principles of corporate law even when considering claims asserted under the Lanham Act. *Id.* at 687. In that matter, the plaintiff had prevailed in its trademark infringement claim against the defendant, *id.* at 684, but because the plaintiff "never tried to make the showing needed for veil-piercing" the court found that "the demand to respect corporate formalities remains," *id.* at 687. "And that demand fits hand-in-glove with the Lanham Act's text[.]" *Id.*

The court finds that piercing the corporate veil was necessary in this matter to hold Wald and Newman liable for Plaintiff's trade dress infringement claim, and Plaintiff has not demonstrated that this case is analogous to the facts in *Sinks* such that the court should disregard the principles of corporate law. Furthermore, Plaintiff has not disputed Defendants' assertion that piercing the corporate veil is necessary to assert state law claims against Wald and Newman (ECF 144 at 53). The court therefore grants Defendants' Motion with regard to Plaintiff's seventh cause of action against Wald and Newman for unfair competition under Utah common law, and grants Defendants' Motion with regard to Plaintiff's third cause of action against Wald and Newman for trade dress infringement.

## IV.    CONCLUSION AND ORDER

For the foregoing reasons, Defendants' Motion for Partial Summary Judgement (ECF 117) is GRANTED IN PART and DENIED IN PART as follows:

1.  Defendants' Motion is GRANTED with respect to Plaintiff's:

    a.  Fourth cause of action for false designation of origin,

    b.  Fifth cause of action for trademark infringement,

    c.  Sixth cause of action for unfair competition under the Utah code,

    d.  Eighth cause of action for misappropriation of trade secrets under state law,

    e.  Ninth cause of action for misappropriation of trade secrets under federal law, and

    f.  Individual claims against Wald and Newman.

2.  Defendants' Motion is DENIED with respect to Plaintiff's:

    a.  Third cause of action for trade dress infringement, and

    b.  Seventh cause of action for unfair competition under Utah common law.

IT IS SO ORDERED.

DATED this 7 April 2025.

Cecilia M. Romero

Magistrate Judge Cecilia M. Romero
United States District Court for the District of Utah