---

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| HARK'N TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> ORANGE WHIP FITNESS X, LLC, <br><br> Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART [386] DEFENDANT'S MOTION FOR ATTORNEY FEES** <br><br> Case No. 1:21-cv-00054-CMR <br><br> Chief Magistrate Judge Cecilia M. Romero |

Before the court is Defendant Orange Whip Fitness X, LLC's (Orange Whip) Motion for Award of Attorney Fees (Motion) (ECF 386) incurred from the defense of the first, second, fourth, fifth, and ninth claims of relief, as well as the claims against two individuals. The court has also considered Plaintiff Hark'n Technologies, Inc.'s (Hark'n) Opposition (ECF 403) and Orange Whip's Reply (ECF 418). Having carefully considered the relevant filings, the court finds that oral argument is not necessary and will decide this matter on the materials presented in the written memoranda. *See* DUCivR 7-1(g). For the reasons herein, the court GRANTS IN PART and DENIES IN PART Orange Whip's Motion.

## I.    BACKGROUND[1]

Following a weeklong trial, a jury reached a verdict in favor of Hark'n on its claims for trade dress infringement, unfair competition, and unjust enrichment (ECF 300). Specifically, the jury found that Orange Whip willfully infringed on Hark'n's protectable trade dress and that Orange Whip willfully engaged in unfair competition (*id.*). The jury further found that the amount

---

[1] Given the court and the parties' familiarity with the facts and procedural history of this dispute, the court will reiterate only the facts and procedural history relevant to the instant motions. A more fulsome description is included in previous court orders (*see, e.g.*, ECF 160 & ECF 251 (memorandum decisions ruling on the motions for summary judgment)).

of profits that Orange Whip received as a result of its willful trade dress infringement and/or unfair competition was $978,024.00 (*id.*). As for unjust enrichment, the jury found Plaintiff was entitled to receive $37,500.00 in damages (*id.*).

Thereafter, Orange Whip filed this Motion seeking an award of attorney fees and costs for defending the seven causes of action that were dismissed by summary judgment, as well as the two causes of action against Wald and Newman (ECF 386 at 1). Defendant asserts various claims of recovery: First, that the Product Design and Manufacturing Agreement (PDMA), although not a binding contract, still permits the recovery of fees related to defending against Hark'n's breach of contract and fraud claims (*id*. at 15–23). Second, the trade secret statutes allow it to recover fees for defending against Hark'n's state and federal trade secret misappropriation claims (*id*. at 23–31). Third, the Bad Faith Exception to the American Rule allows it to recover fees for Hark'n's trademark infringement, false designation of origin claims, and fees for bad faith refusal to produce a representative sample (*id*. at 31–39).

For the reasons explained below, the court finds that Orange Whip cannot recover fees under the PDMA or the Bad Faith Exception to the American Rule. The court, however, finds that Orange Whip is entitled to fees for defending against the two secret trade claims.

## II.    DISCUSSION

### A.    Orange Whip is entitled to fees for defending against the trade secret claims.

Hark'n brought two claims for trade secret misappropriation against Orange Whip, in the Eighth Cause of Action for misappropriation of trade secrets under the Utah Uniform Trade Secrets Act (UUTSA), Utah Code § 13-24-1, and the Ninth Cause of Action for misappropriation of trade secrets under the Defend Trade Secrets Act (DTSA), 18 USC § 1836 (ECF 418 at 23). Both claims were dismissed by summary judgment (ECF 251). Orange Whip asserts that under

these two statutes, it can recover fees from prevailing over these claims because they were made in bad faith (ECF 386 at 18).

The court may award the prevailing party reasonable attorney fees under the DTSA and the UUTSA, "[i]f a claim of misappropriation is made in bad faith[.]" Utah Code Ann. § 13-24-5; *see* also 18 U.S.C. § 1836(b)(3)(D) (allowing a claim of bad faith). Neither statute defines bad faith. This court recently found that bad faith under both statutes requires a two-step inquiry: "The court must find that (1) the plaintiff's claims were objectively specious or frivolous, and (2) there is evidence of subjective misconduct." *Applied Predictive Techs., Inc. v. Marketdial, Inc.*, No. 2:19-CV-00496-JNP-CMR, 2025 WL 906182, at *2 (D. Utah Mar. 25, 2025) (citing *Hammerton, Inc. v. Heisterman*, No. 2:06–CV–806 TS, 2008 WL 4057010, at *7 (D. Utah 2008)). Furthermore, "the award of attorney fees is subject to the trial court's discretion, to be overturned only for abuse of discretion." *Id*. (quoting *Lam, Inc. v. Johns-Manville Corp.*, 668 F.2d 462, 476 (10th Cir. 1982)).

As a preliminary matter, both parties raise arguments regarding which party was the "prevailing party" in this suit. However, under the DTSA and the UUTSA, it is only required that a party prevail over a "claim" of trade secret misappropriation. There is no requirement that a party be the prevailing party over the entire case. As such, Orange Whip was clearly the prevailing party over Hark'n's state and federal trade secret misappropriation claims, as they were successfully dismissed by summary judgment. Thus, finding that Orange Whip prevailed on both claims, the court then considers whether Hark'n brought them in bad faith.

### 1. *Hark'n's trade secret claims were objectively specious.*

Orange Whip argues that the trade secret claims were objectively specious because Hark'n could not identify the asserted trade secret and could not provide any evidence to support the theory of trade secret misappropriation (ECF 386 at 25). Hark'n claims that it did identify its

trade secrets, but the court dismissed its claims due to the lack of a finding that it had "communicated" its trade secrets (ECF 403 at 23). Hark'n further asserts the trial results prove that Orange Whip acquired its trade secrets through improper means and had them reverse-engineered, indicating that there was at least some evidence to support the trade secret claims (*id*. at 24).

Courts have defined "objective speciousness" as "a complete lack of evidence supporting Plaintiff's claims." *Applied Predictive*, 2025 WL 906182, at *4 (quoting *SGS Acquisition Co. Ltd. v. Linsley*, 2023 WL 2681946, at *3 (D. Colo. 2023)). "A specious claim is one that 'superficially appears to have merit but there is a complete lack of evidence to support [it].'" *Id*. at *4 (quoting *Workplace Techs. Research, Inc. v. Project Mgt. Inst., Inc.*, 664 F. Supp. 3d 1142, 1159 (S.D. Cal. 2023) (interpreting the "speciousness" requirement under the California Uniform Trade Secrets Act)). "[A] specious claim may even sound logical or convincing, but it is ultimately hollow and lacks substantiation." *Id*.

Also helpful to the court's analysis of this prong is *Applied Predictive*, in which the court found that the defendant had access to the plaintiff's confidential information; however, the plaintiff could not provide any evidence of any trade secret implicated by that information. *Id*. at *2. The court further found that the plaintiff's trade secret claims, while not objectively frivolous from the outset, were objectively specious considering that the plaintiff "was never able to define the trade secret at the heart of its claim." *Id*. at *4. The plaintiff failed to provide a clear explanation of the trade secret and only offered broad assertions, vague and ambiguous definitions, and conclusory statements. *Id*. at *3. Furthermore, "rather than dismissing the claims or litigating the case in a professional manner, [the plaintiff] doubled down on its assertions" despite the lack of evidentiary support. *Id*. at *2.

Here, review of the record shows that Hark'n, like the plaintiff in *Applied Predictive*, did not clearly define the trade secret at the center of its claims. It is undisputed that Shon Harker (Harker), Hark'n's president, spent time developing prototypes and that prototypes were sent to Orange Whip. While these prototypes could include trade secrets, Hark'n did not identify the trade secret(s) included in the prototypes. Hark'n broadly argued that the trade secret information included:

> [T]he specifications for the bands and attachments used in the GFX-PPR prototypes. . . the selection of materials from which the attachments are made (e.g., plastic, Velcro, and/or metal); the type, size, and design of the various straps, clips, handles, and rings used in the prototypes, and the resistance levels of the elastic bands.

(ECF 144 at 47). This court, when ruling on Orange Whip's summary judgment motion, found that "[w]hile a prototype itself could potentially constitute a trade secret, *Plaintiff has not alleged facts or pointed to evidence that would support such a position regarding the prototypes given to Defendants*. In fact, Harker's testimony on this point demonstrates the opposite to be true" (ECF 251 at 34 (emphasis added)). Therefore, a primary reason for dismissing the trade secret claims was that Hark'n's definition of its trade secrets was incompatible with Harker's sworn testimony. This inconsistency is crucial because it prevents the court from concluding that Hark'n defined its trade secrets.

During his deposition, Harker claimed that the prototypes contained trade secrets (ECF 120-6 at 114). However, when asked whether he shared any "confidential" or "proprietary" information with Orange Whip, Harker stated, "No," and "not that I recall" (*id.*). Harker knew that Orange Whip had the prototypes, yet testified, under oath, that no confidential or proprietary information was shared with Orange Whip. While Harker's testimony indicates that no trade secrets were "communicated," it also cuts against Hark'n's definition of its trade secrets.

5

Hark'n cannot simultaneously credibly assert that: (1) the prototypes contained trade secrets; and (2) no confidential or proprietary information was shared with Orange Whip, who was clearly in possession of the prototypes. Because of this inconsistency, the court, like when it dismissed the trade secret claims, remains uncertain about which pattern, compilation, program, device, method, technique, or process of the prototype (if any) constitutes the alleged trade secret at the core of Hark'n's claims. Therefore, the court finds that Hark'n's trade secret claims were objectively specious for failure to define the trade secret at the heart of its claims.

Furthermore, Hark'n's assertion that its claims were dismissed solely because they were uncommunicated is unfounded. The court, when dismissing Hark'n's trade secret claims, stated: "[W]ith respect to what is alleged to be the trade secret, Plaintiff's position has not been entirely clear, or properly supported" (ECF 251 at 33). Like the plaintiff in *Applied Predictive*, Hark'n, in support of its trade secret claims, only offered broad assertions, vague and ambiguous definitions, and conclusory statements that it could not support. As previously mentioned, to this day, it is still unclear what Hark'n's trade secrets are. To prove a claim under the DTSA and the UUTSA, the plaintiff must first show that a trade secret exists, a requirement Hark'n failed to meet. Thus, even though the claim superficially appeared to have merit from the outset, it ultimately lacked any evidentiary support. *See Applied Predictive*, 2025 WL 906182, at *4.

Lastly, Hark'n's claim that the trial results prove that Orange Whip "acquired" its trade secrets through improper means is unfounded (ECF 251 at 24). The jury found that Orange Whip willfully infringed on Hark'n's protectable trade dress, not that it had acquired or misappropriated any trade secrets (ECF 300). The trial results offer no support for Hark'n's trade secret claims.

2.    *Hark'n engaged in subjective misconduct.*

Orange Whip asserts that Hark'n engaged in subjective misconduct because "[i]t was apparent from the outset that [Hark'n's] trade secrets claims were fruitless, yet [Hark'n] recklessly went ahead with bringing the claim and took no steps to act in good faith" (ECF 386 at 29). According to Hark'n, the events leading up to this litigation indicate that there was no subjective misconduct (*see* ECF 403 at 27). Hark'n specifically argues that, before this litigation, Orange Whip created prototypes for Orange Whip using industry technology and know-how for over 20 years; that Orange Whip withdrew from negotiations after accepting the prototypes; and that products with a similar appearance entered the market without sourcing from Hark'n (*id*.). Under these facts, to Hark'n, it appeared that Orange Whip had another supplier reverse engineer Hark'n's products; so, at a very minimum, the trade secret claims were brought in good faith (*id*.).

A court may find subjective misconduct "where a plaintiff knows or is reckless in not knowing that its claim for trade secret misappropriation has no merit." *Applied Predictive*, 2025 WL 906182, at *5 (quoting *Contract Materials*, 222 F. Supp. 2d at 744). "Subjective misconduct may be proven by direct evidence of actual knowledge or may be inferred from the speciousness of plaintiff's trade secret claim and its conduct during litigation." *Id.*

In *Applied Predictive*, the court contrasted the plaintiff's actions with the actions of the plaintiff in *Hammerton, Inc. v. Heisterman*, No. 2:06-CV-806 TS, 2008 WL 4057010 (D. Utah Aug. 25, 2008). 2025 WL 906182, at *5. In *Hammerton*, when the deficiencies in the plaintiff's trade secret claims were pointed out in the defendants' summary judgment motion, the plaintiff withdrew all its trade secret claims except for one. *Id*. at *8. The plaintiff's remaining trade secret claim survived summary judgment; nonetheless, the plaintiff moved to dismiss that claim with prejudice to avoid a fruitless trial. *Id*. The *Hammerton* defendants argued that the trade secret

7

claims were brought in bad faith, as evidenced by the plaintiff's voluntary withdrawals. *See id*. The *Hammerton* court, applying the two-pronged definition of bad faith, found that the "withdrawn claims were objectively without merit"; however, there was insufficient evidence to find subjective misconduct. *Id*.

The court reasoned that although the plaintiff had taken a broad approach in pleading its trade secret claims, the plaintiff's surviving claim "was clearly not baseless" as evidenced by the fact that it survived summary judgment. *Id*. The fact that the plaintiff broadly framed the trade secret claims surrounding the surviving claim did not, by itself, constitute a finding of subjective misconduct. *Id*. The court further reasoned that the plaintiff acted in good faith by withdrawing the earlier claims when their deficiencies were pointed out in summary judgment. *See id*. Therefore, because one of the plaintiff's trade secret claims survived summary judgment, and there was evidence of good faith on the part of the plaintiff, the court found there was insufficient evidence of subjective misconduct.

In contrast, the court in *Applied Predictive* found subjective misconduct because, "rather than dismissing the claims or litigating the case in a professional manner, [the plaintiff] doubled down on its assertions" despite the lack of evidentiary support. *Applied Predictive*, 2025 WL 906182, at *2, 5 ("But unlike the *Hammerton* plaintiff, APT did not take any steps to withdraw its trade secret claims when it became apparent that it had no evidence to support them. Instead, APT did the opposite. It sought to aggressively litigate the issue."). Like the plaintiff in *Applied Predictive*, when it became apparent that there was no evidence to support its trade secret claims, Hark'n continued to litigate the issue.

In this case, Harker admitted that no confidential or proprietary information was shared with Orange Whip on July 31, 2024 (*see* ECF 120-6); this was also the date that fact discovery

8

ended (*see* ECF 90). Despite evidence to the contrary and no time left for discovery, on December 11, 2024, five months after Harker's admission and the close of fact discovery, Hark'n opposed Orange Whip's summary judgment motion, claiming there was "no question regarding the existence of Plaintiff's trade secrets or the fact that Plaintiff shared them with defendants" (ECF 144 at 46). Like the plaintiff in *Applied Predicative*, Hark'n continued to litigate the issue. Unlike *Hammerton*, Hark'n had no trade secret claims survive summary judgment, and there is no evidence of good faith actions for the court to rely on. Thus, while there may not have been any subjective bad faith when the claims were first made, Hark'n acted in subjective bad faith by continuing to assert its trade secret claims despite knowing they lacked merit.

Furthermore, Hark'n's assertion that the trial results indicate that there was no subjective misconduct regarding the trade secret claims is unfounded. As previously stated, the jury found that Orange Whip willfully infringed on Hark'n's protectable *trade dress*, not that it had acquired or misappropriated any trade secrets, as the trade secrets issue was never before the jury (*see* ECF 300).

Finally, Hark'n argues even if there is a finding of bad faith, the court should exercise its discretion to deny fees given Orange Whip's behavior. While it is true the jury found trade dress infringement and unfair competition, that does not diminish Hark'n's obligation to bring forth claims in good faith. While at the beginning of a case that assessment may not be complete, here Hark'n had an opportunity to evaluate its case after the close of discovery and failed to take corrective action.  The court therefore declines the request to not impose fees.

> 3. *Orange Whip's fees incurred defending the trade secret claims are reasonable.*

Under the DTSA and the UUTSA, the court may "award reasonable attorney fees to the prevailing party" if it finds "a claim of misappropriation is made in bad faith." 18 U.S.C. §

1836(b)(3)(D); *see also* Utah Code Ann. § 13-24-5. Finding Hark'n's trademark claims were made in bad faith, the court now turns to what fees are reasonable. The Declaration of Scarlet R. Smith (ECF 386-2), which was attached to Orange Whip's Motion, specifically indicates that Orange Whip incurred $7,076.00 in attorney fees defending Hark'n's trademark claims (*id*. at 6). The Declaration further specifies that 36.6 hours were allocated to these claims, resulting in an average hourly rate of $193.33 ($7,076.00 ÷ 36.6 hours = $193.33 per hour) (*id*.). For the reasons stated below, the court finds that Orange Whip's request for attorney fees in the amount of $7,076.00 is reasonable.

"'An award of attorney fees must be supported by evidence in the record,' which 'should include the hours spent on the case, the hourly rate or rates charged for those hours, and usual and customary rates for such work.'" *JTP Recovery Servs., Inc. v. Hilti, Inc.*, No. 2:19-CV-00738-JNP, 2022 WL 16948768, at *1 (D. Utah Nov. 15, 2022) (quoting *Xlear, Inc. v. Focus Nutrition, LLC*, 893 F.3d 1227, 1241 (10th Cir. 2018)). In determining the reasonableness of the fee request, the court considers: "[T]he difficulty of the litigation, the efficiency of the attorneys in presenting the case, the reasonableness of the number of hours spent on the case, the fee customarily charged in the locality for similar services, the amount involved in the case and the result attained, and the expertise and experience of the attorneys involved." *Id.* at *2 (quoting *Dixie State Bank v. Bracken*, 764 P.2d 985, 989 (Utah 1988)). Further, "the court will not scrutinize in detail every entry made by Defendants. This is not an audit." *Applied Predictive*, 2025 WL 906182, at *6.

The court finds that Orange Whip's attorney fees incurred are supported by the record. The 36.6 hours spent are reasonable, given the amount of research, discovery, and briefing required to dismiss these claims. The court further finds that an average hourly rate of $198.33 is reasonable compared to the usual and customary rates for such work. *See Mrs. Fields Franchising, LLC v.*

10

*MFGPC, Inc.*, No. 2:15-CV-00094-DAK, 2021 WL 5086377, at \*8 (D. Utah Nov. 2, 2021) (holding that rates less than $500 per hour "are reasonable and consistent with local market rates").

Hark'n in its Opposition raises several issues regarding Orange Whip's allocation of fees, primarily asserting that Orange Whip "has engaged in an egregious attempt to over-allocate fees to unsuccessful claims" (ECF 403 at 31). While Hark'n provides detailed arguments regarding the manner in which Orange Whip allocated fees regarding defending the contract and fraud claims, there are no specific allegations contesting the reasonableness of the fees incurred defending the trade secret claims (*see id*. at 31–37). Therefore, the court finds that Hark'n's arguments are not persuasive enough to diminish the amount claimed by Orange Whip. Thus, an award of attorney fees in the amount of $7,076.00 for the defense of Hark'n's trade secret claims is reasonable.

For the reasons stated above, Orange Whip's motion for attorney fees is GRANTED only concerning the fees it incurred defending against Hark'n's two trade secret claims.

### B.  Orange Whip cannot recover fees under the PDMA.[2]

Orange Whip asserts that although the PDMA was deemed unenforceable, because Hark'n's breach of contract claim is based on the enforcement of the PDMA, the fee provision within it may still be enforced under Utah Code § 78B-5-826 (ECF 386 at 15). Orange Whip further asserts that because Hark'n's First Cause of Action for Fraud and Second Cause of Action for Breach of Contract were inextricably intertwined, Orange Whip can recover the fees incurred defending the fraud claim (*id*. at 14).

---

[2] "A federal court exercising supplemental jurisdiction over state-law claims 'applies the substantive law, including choice of law rules, of the forum state.'" *Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1224 (D. Utah 2018) (quoting *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999)). Because the relevant events underlying Hark'n's claims occurred in Utah, and the parties seemingly agree that Utah law applies to Hark'n's state law claims, the court applies Utah's substantive law to Orange Whip's claims for fees under the PDMA.

Because unilateral attorney fee provisions grant one side a financial advantage in litigation, Utah Code § 78B-5-826 (the Reciprocal Attorney Fees Statute) was "designed to create a level playing field" in contract disputes by making unilateral fee provisions mutual in certain circumstances. *Bilanzich v. Lonetti*, 160 P.3d 1041, 1046 (Utah 2007). The statute states that:

> A court may award costs and attorney fees to either party that prevails in a civil action based upon any promissory note, written contract, or other writing executed after April 28, 1986, when the provisions of the promissory note, written contract, or other writing allow at least one party to recover attorney fees.

Utah Code Ann. § 78B-5-826. Judge J. Frederic Voros, Jr., of the Utah Court of Appeals, in his concurrence to *Torres v. Madsen*, 344 P.3d 652 (Utah Ct. App. 2015), noted that the Reciprocal Attorney Fee Statute "clearly states at least three distinct requirements: (1) *a writing executed after a certain date*, (2) a civil action based upon that writing, and (3) a provision allowing at least one party to recover fees[.]" *Torres*, 344 P.3d 652, 654 (Utah Ct. App. 2015) (Voros, J., concurrence) (emphasis added). Though neither party identified this case, here, the first requirement, which requires the writing to be "executed" is of particular importance.

Judge Voros' concurrence in *Torres*, while not binding, provides highly persuasive authority regarding the application of the Reciprocal Attorney Fee Statute. In *Torres*, Anthony B. Torres and Yvette Torres (Torreses) brought a complaint against the defendants who had signed a letter of intent to sell their restaurant to the Torreses. *Torres*, 344 P.3d at 652. The Torreses, relying on the letter of intent, prepared a purchase agreement, which the defendants rejected and never signed. *Id*. On summary judgment, the district court ruled in favor of the defendants, finding the letter of intent unenforceable. *Id*. The defendants filed a counterclaim seeking recovery of attorney fees, asserting that the Torreses' complaint "relied on the unsigned Purchase Agreement, which contained a provision for payment of attorney fees." *Id*. The defendants argued that because the

12

Torreses "sought to enforce a contract which had an attorney fee provision," the defendants were "entitled to recover their attorney fees and costs" even though the contract was unenforceable. *Id*.

In response, the Torreses argued that all their contract-related claims were based on the letter of intent, not the unsigned purchase agreement. *Id*. at 653. The district court found that the Torreses' contract-related claims were based upon the letter of intent, which did not contain an attorney fee provision. *Id*. Alternatively, the court found that the Reciprocal Attorney Fee Statute did not apply to the purchase agreement because it was never "executed." *Id*. The defendants appealed, citing *Hooban v. Unicity International, Inc.*, 285 P.3d 766 (Utah 2012), and argued that execution was not necessary. *Id*.

On appeal, the Utah Court of Appeals affirmed the district court's denial of fees but did not decide whether an unsigned document could support fees under the statute. The court noted that it did not have to reach this issue because the Torreses' contract-related claims were based on the letter of intent, not the unsigned purchase agreement. *Id*. at 653–654. Judge Voros agreed with the result but addressed whether an unexecuted document could support fees under the Reciprocal Attorney Fee Statute.

As stated above, Judge Voros emphasized that the statute requires the writing to be "*executed* after April 28, 1986." *Id*. at 654 (Voros, J., concurrence) (emphasis added). Any other reading of the clear statutory language would "override the clear terms of the statute." *Id*. at 655. Judge Voros also noted that requiring that the writing be "executed" does not conflict with the Utah Supreme Court's opinion in *Hooban*, because *Hooban* "addresses only the statutory requirement that the action be 'based upon' a writing, not the statutory requirement that the writing be 'executed.'" *Id*. He further noted that the *Hooban* opinion "does not mention, much less abrogate, the portion of the Reciprocal Attorney Fees Statute limiting the statute's application to

13

writings 'executed after April 28, 1986.' In fact, the [*Hooban* Court's] quotation of the statutory text elides that phrase." *Id*. (citing *Hooban*, 285 P.3d at 768). The court agrees with Judge Voros and finds his reasoning to be highly persuasive.

The court also observes that any other interpretation of the "execute" language within the Statute would render the phrase "after April 28, 1986" meaningless and unworkable. Such a view could lead to needless debates over when an unsigned document was allegedly "executed." Because contracts often go through multiple drafts and iterations before signatures are ever added, parties would point to different moments of execution. The legislature's choice to include the term "executed" and a clear cutoff date reflects an intent to avoid this kind of uncertainty. Therefore, the court finds that the Reciprocal Attorney Fees Statute does not apply to writings that are not "executed." Here, it is undisputed that the PDMA was not "executed," as this court already ruled that a "meeting of the minds was never reached between the parties." (ECF 160 at 11, 14). Orange Whip's assertion that it can recover fees under the unexecuted PDMA is unfounded.

This ruling is consistent with *Bilanzich v. Lonetti*, 160 P.3d 1041 (Utah 2007), and *Wing v. Code*, 387 P.3d 601 (Utah Ct. App. 2016); two cases Orange Whip relies on for recovery under the PDMA. In each of the cases, the primary concern was whether the litigation was "based" on the writing, not whether the writing in question was "executed."

Orange Whip argues that the holding in *Bilanzich* that "the statute's plain language does not require that the writing actually be enforceable," 160 P.3d at 1045, means it does not need to be executed. In *Bilanzich*, the writing in question was a personal guaranty for business debt signed by the guarantor. *Id*. at 1043–4. The guaranty was found unenforceable due to a failure of a condition precedent. *Id*. Thus, the primary concern was whether the unenforceable guaranty could serve as a basis for fees under the Reciprocal Attorney Fees Statute. The Utah Supreme Court held

that even though the guaranty was unenforceable, the statute allowed the guarantor to recover attorney fees because the action was "based" on a writing that allowed at least one party to recover fees. *Id*. at 1047.

*Bilanzich* does not, however, eliminate the Reciprocal Attorney Fees Statute's execution requirement. The *Bilanzich* opinion recognizes that an "executed" writing, which is later found unenforceable on other grounds, can still serve as the basis for reciprocal attorney fees. *See id*. at 1047. Any other reading of the *Bilanzich* opinion would "override the clear terms of the statute." *Torres*, 344 P.3d at 655 (Voros, J., concurrence).

In *Wing*, the writing at issue was a For Sale by Owner Agreement (the FSBO), which was clearly "executed." *Wing*, 387 P.3d at 602. The main issue was whether the FSBO's fee clause could be enforced against an individual who was not a party to the FSBO but nonetheless initiated litigation under the "right to enforce the [FSBO]." *Id*. at 603. *Wing* provides no support for Orange Whip's assertion that the *unexecuted* PDMA can be the basis for fees under the Reciprocal Attorney Fees Statute.

For these reasons, the court DENIES Orange Whip's claim for fees under the PDMA. Furthermore, Orange Whip's sole basis for recovery of fees under its fraud claim was the PDMA. Because the court denies the claim for fees under the PDMA and there is no other basis for Orange Whip to recover fees related to dismissing Hark'n's fraud claim, the court denies any claim for fees as to the fraud claim.

### C. Orange Whip cannot recover fees under the American Rule's Bad Faith Exception.

Orange Whip argues the Bad Faith Exception to the American Rule (Bad Faith Exception) allows it to recover fees. In support, Orange Whip asserts the following evidence of Hark'n's alleged bad faith throughout this litigation: (1) Hark'n failed to produce a representative

15

sample; and (2) Hark'n's Fourth Cause of Action for False Designation of Origin and Fifth Cause of Action for Trademark Infringement were brought in bad faith (ECF 386 at 31–39). Before continuing, the court addresses two preliminary matters.

First, it is unclear whether Orange Whip is claiming that the Bad Faith Exception permits it to recover fees incurred from defending all the claims it successfully dismissed, or whether it is only claiming that the exception is limited to the recovery of fees incurred for defending against Hark'n's trademark infringement and false designation of origin claims. Despite this lack of clarity, because the court ultimately finds that the Bad Faith Exception does not apply here, the court's ruling is not affected by whether the exception is limited to two causes of action or more.

Second, Orange Whip appears to seek fees not only under the Bad Faith Exception under federal law, but also under Utah Code § 78B-5-825, which is Utah's bad-faith statute (*see* ECF 386 at 26 ("Consistent with the common law principles discussed above, Utah Code section 78B-5-825 states that a district court may award attorney fees. . .")). To the extent that Orange Whip is seeking fees under § 78B-5-825, this assertion fails as a matter of law as § 78B-5-825 has no application in federal court. *See Taylor v. Nat'l Collegiate Student Loan Tr. 2007-1,* Case No. 2:19-CV-00120-BSJ, 2021 WL 872494, at *2 (D. Utah Mar. 9, 2021) ("[T]he Tenth Circuit has explained that in diversity cases, fees that are based on a litigant's bad faith conduct are procedural fees and are thus governed by the federal rules . . . [Thus, § 78B-5-825 is] inappropriate to justify [a] sanction . . . for bad faith.") (citing *Chieftain Royalty Co. v. Enervest Energy Institutional Fund XIII-A, L.P.*, 888 F.3d 455, 460–61 (10th Cir. 2017)). Therefore, the court makes no mention of § 78B-5-825 in the analysis below and only analyzes whether the Bad Faith Exception applies under federal law. For the reasons stated below, the court finds that it does not.

When considering the circumstances under which a court may award attorney fees, the basic point of reference is "the bedrock principle known as the 'American Rule': Each litigant pays his own attorney fees, win or lose, unless a statute or contract provides otherwise." *Kornfeld v. Kornfeld*, 393 Fed. App'x, 575, 578 (10th Cir. 2010) (quoting *Hardt v. Reliance Standard Life Ins. Co.,* 130 S.Ct. 2149, 2156–57 (2010)). "An exception to this general rule, however, grants courts the power to award attorney fees when the interests of justice so require, particularly where a litigant has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Mt. W. Mines, Inc. v. Cleveland-Cliffs Iron Co.*, 470 F.3d 947, 953–54 (10th Cir. 2006) (quoting *Sterling Energy, Ltd. v. Friendly Nat'l Bank*, 744 F.2d 1433, 1435 (10th Cir. 1984)). The district court has broad discretion in determining whether this exception applies. *Sterling Energy*, 744 F.2d at 1435–6 (10th Cir. 1984) (citing *Ryan v. Hatfield,* 578 F.2d 275, 277 (10th Cir. 1978)).

The Tenth Circuit "sets a high bar for bad faith awards, 'otherwise those with colorable, albeit novel, legal claims would be deterred from testing those claims in a federal court.'" *Mt. W. Mines*, 470 F.3d at 954 (quoting *Sterling Energy*, 744 F.2d at 1435). Consequently, the Tenth Circuit has repeatedly held that this exception only applies in the most exceptional circumstances and only when there is clear evidence that the party acted with bad intent or improper purpose. *See id*. ("Accordingly, 'we have insisted that a trial judge make a finding of bad intent or improper motive.'" (quoting *Sterling Energy*, 744 F.2d at 1437)); *see also F.D.I.C. v. Schuchmann*, 319 F.3d 1247, 1254 (10th Cir. 2003) (reversing the district court's award of fees under the bad faith exception because the evidence of bad faith "fell short of the clear evidence of bad intent that is required to award attorney fees and costs.").

When a party is asserting that a specific claim was brought in bad faith, as opposed to specific conduct, the Tenth Circuit employs the following two-pronged test to determine whether

17

the claim was brought in bad faith: "A party acts in bad faith only when the claim brought 'is entirely without color *and* has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons.'" *Freecom*, 401 F.3d at 1201 (quoting *Sterling Energy*, 744 F.2d at 1435). The district court must find that "clear evidence" supports each prong. *Id*. ("'[Attorney fees] are awarded only when there is "clear evidence" that challenged actions are taken entirely without color and are pursued for [improper] reasons [.]'") (quoting *Autorama*, 802 F.2d at 1288).

> 1.    *There is no clear evidence that Hark'n acted with bad intent by failing to produce a representative sample.*

Orange Whip alleges that Hark'n acted in bad faith by failing to produce representative samples during discovery despite multiple assurances that it would do so, and then later claiming it had no memory of discussing the samples (ECF 386 at 32). Orange Whip asserts that withholding the samples deprived Orange Whip of a meaningful defense and deprived the jury of the ability to make an accurate conclusion (*id*). Hark'n gives many reasons why it did not act in bad faith by failing to produce representative samples, but it primarily relies on the assertion that Orange Whip only made "informal requests" for the samples (ECF 403 at 28–30; ECF 352 at 26–33).

The history regarding the parties' discussion of representative samples is as follows. In January 2023, Orange Whip served its first set of discovery requests requesting for production "[r]epresentative samples of all tags, labels, signs, and packaging that have displayed or that will display the Asserted Marks, including documents sufficient to show every manner of presentation of the Asserted Marks in such materials" (ECF 218-5 at 9 request No. 4 and ECF 386 at 28). Hark'n indicated that it would "produce responsive documents" (ECF 193-3 and ECF 386 at 28). Over a year later, after not receiving the samples, Hark'n repeated its request in May and July of 2024 (ECF 193-3 at 3; ECF 193-4 at 2; ECF 386 at 32–39). At a meet and confer, which took place on May 9, 2024, Hark'n's counsel expressly stated that he would provide Orange Whip with the

samples (*see* ECF 246). Despite Orange Whip's multiple requests, representative samples were never produced. Hark'n's counsel asserted that they had no recollection of discussion on representative samples and substantiated this assertion by submitting declarations from attorneys Alan Bradshaw (Bradshaw), Carson Fuller (Fuller), and Hark'n's former attorney Stephen Bean (Bean), stating no recollection of a discussion on representative samples (ECF 218-2, 3 & 4).

Accordingly, Orange Whip filed Motion in Limine No. 11 (ECF 193) requesting the court to "exclude representative samples from trial" because Hark'n "failed or refused to produce them in discovery" (ECF 193). This court granted Orange Whip's Motion in Limine, because the introduction of the samples so close to trial would create prejudice with insufficient time before the trial to cure the prejudice (ECF 277 at 13). In addition to finding prejudice, this court noted that: "failure to produce these samples also appears to have been willful and not in good faith" because the declarations of Bradshaw, Fuller, and Bean were directly contradicted by Bean's agreement to send "five or six different configurations" to Orange Whip, at the close of the meet and confer on May 9, 2024 (ECF 248).

The record indicates that Hark'n, despite multiple assertions that it would send a sample, never actually did so. The record also indicates that attorneys Bradshaw, Fuller, and Bean provided inaccurate sworn declarations regarding the parties' discussions about the samples. Notwithstanding, the court does not find the Tenth Circuit's high bar of clear evidence of subjective bad intent. In the Tenth Circuit, a party acts in bad faith "'only when there is "clear evidence" that challenged actions are taken entirely without color and are pursued for reasons of harassment or delay.'" *Schuchmann*, 319 F.3d at 1250 (quoting *Autorama*, 802 F.2d at 1288). Thus, district courts in this circuit are "required to explicitly find improper motive. 'Suspicions'

or the 'appearance' of such a motive is not enough." *Id*. at 1253 (10th Cir. 2003). Hark'n's actions do not meet this standard.

The jury was instructed to determine whether Orange Whip had infringed upon Hark'n's trade dress, which Orange Whip alleges was the "configuration" of Hark'n's bands. Orange Whip's main contention is that without the physical samples, the jury was confused about "the actual product configuration" (ECF 386 at 34). Orange Whip, however, never formally requested representative samples of Hark'n's product configurations. Orange Whip's only formal request for samples was in January 2023, where it specifically asked for "[r]epresentative samples of all tags, labels, signs, and packaging that have displayed or that will display the *Asserted Marks*, including documents sufficient to show every manner of presentation of the *Asserted Marks* in such materials" (ECF 218-5 at 5 (emphasis added)). In this formal request, Orange Whip sought representative samples of Hark'n's "Asserted Marks," not asserted trade dress.

Although Hark'n's counsel agreed to provide Hark'n with representative samples of "five or six configurations," this was an informal agreement between the parties not linked to any formal discovery request. Orange Whip's decision not to obtain a court order requiring production further suggests this was, at most, an informal discovery dispute. While Hark'n's actions were unprofessional, the court cannot find "clear evidence" of subjective bad faith, wantonness, harassment, or any improper motive. Rather, the court's ruling finding the "failure to produce these samples also appears to have been willful and not in good faith" was limited to the conflict in the attorney declarations versus the transcript, and not broader bad faith, wantonness, or harassment.

Moreover, the court's assertion of an "appearance" of bad faith is not dispositive. According to *Schuchmann*, an "appearance" of bad faith is insufficient; the court must establish actual improper intent, supported by clear evidence. *Schuchmann*, 319 F.3d at 1253 (ruling that

20

district courts in this circuit are "required to explicitly find improper motive. 'Suspicions' or the 'appearance' of such a motive is not enough"). Furthermore, when the court made its passing statement on bad faith, it was not reviewing the record under the Tenth Circuit's stringent definition of bad faith, which requires an explicit finding of improper motive. As detailed above, when the record is examined under this standard, it shows no clear evidence of improper intent.

2.     *There is no clear evidence that Hark'n brought its trademark and false designation of origin claims in bad faith.*

Orange Whip argues that Hark'n's claims for false designation of origin and trademark infringement were brought in bad faith because they lacked any "evidentiary and legal foundation" and were made without "an honest belief in the propriety of the activities in question." (ECF 386 at 37 (quoting *Laws v. Grayeyes*, 498 P.3d 410, 419 (Utah 2021))). Accordingly, Orange Whip requests an award of attorney fees incurred in defending against these claims.

Hark'n's trademark and false designation of origin claims were dismissed by summary judgment because the court determined that there was no evidentiary support for either claim (*see* ECF 251 at 25, 29). Although these claims were dismissed, Orange Whip must show that the claims were (1) brought entirely without color *and* (2) have been asserted for improper reasons. *Freecom*, 401 F.3d at 1201 (quoting *Sterling Energy*, 744 F.2d at 1435).

Orange Whip's argument is flawed for two reasons. First, to support its position, Orange Whip relies on *Laws,* but it is a Utah Supreme Court case exclusively addressing Utah's bad-faith statute, Utah Code § 78B-5-825. 498 P.3d at 418, 423 (finding that the district court did not err by relying on section 78B-5-825).

Second, even if Orange Whip had supported its arguments with valid authority, its Motion primarily asserts that the claims were brought without evidence (i.e., without color) but fails to make any reasonable arguments that they were brought for improper reasons (*see* ECF 386

21

at 37–39). Orange Whip's main argument is that fees are warranted because Hark'n "had no evidence and lacked 'an honest belief in the propriety of the activities in question.'" (ECF 386 at 37) (quoting *Laws*, 498 P.3d at 419). However, even if Orange Whip were correct and the claims were brought without color, the court must still find subjective wrongdoing. *See Mt. W. Mines, Inc.*, 470 F.3d at 954 (finding that even when a claim is "so frivolous as to reflect impermissible conduct," the court must still make a finding of subjective wrongdoing. (quoting *Rutledge v. Sunderland,* 671 F.2d 377, 382 (10th Cir. 1982))).

The only evidence suggesting these claims were brought for improper reasons is that they were dismissed for lack of evidentiary support. This alone is insufficient to support a finding of improper motive. *See Mt. W. Mines, Inc.*, 470 F.3d at 954. In fact, the record indicates that Hark'n asserted these claims under a good faith belief that Orange Whip had given customers the impression that they had received a product sourced by Hark'n, and that Orange Whip had used Hark'n's trademarks to sell its products. Although Hark'n could not support these claims, there is no evidence indicating conscious wrongdoing by Hark'n in bringing these claims. *See Sterling Energy*, 744 F.2d at 1437. The court thus concludes there is no clear evidence that Hark'n brought its trademark and false designation of origin claims in bad faith.

### III.   CONCLUSION AND ORDER

For the foregoing reasons, Orange Whip's Motion for Attorney Fees (ECF 386) is GRANTED IN PART and DENIED IN PART, and the court ORDERS as follows:

1. Orange Whip's requests for fees under the PDMA and the Bad Faith Exception to the American Rule are DENIED.

2. Orange Whip's fees under the Defend Trade Secrets Act (DTSA), and the Utah Uniform Trade Secrets Act (UUTSA) are GRANTED. The court ORDERS Hark'n to pay Orange Whip $7,076.00 in attorney fees.

IT IS SO ORDERED

DATED this 24 March 2026.

_____
Chief Magistrate Judge Cecilia M. Romero
United States District Court for the District of Utah